In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2242

Ronald F. Butera,

Plaintiff-Appellant,

v.

Jack L. Cottey, Sheriff of Marion County,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 97 C 2014--Larry J. McKinney, Chief Judge.

Argued November 9, 2001--Decided April 4, 2002


Before Manion, Kanne, and Rovner, Circuit
Judges.

Kanne, Circuit Judge.  After plaintiff
Ronald Butera was sexually assaulted by
two other detainees in his cellblock, he
sued Jack Cottey, the Sheriff of Marion
County, under 42 U.S.C. sec. 1983,
alleging that the Sheriff deprived him of
due process under the Fourteenth
Amendment. The district court granted
summary judgment in favor of the Sheriff.
We affirm.

I.  History

A.  The Sexual Assault

After being arrested for robbery and
assault in December 1996, Butera was
detained in cellblock 2-I of the Marion
County Jail ("Jail"). The parties
stipulated that on January 6, 1997,
detainees Brian Mitchell and James
Eskridge sexually assaulted Butera in
cellblock 2-I. Butera testified at his
deposition that for several days before
the assault, Mitchell and Eskridge had
verbally threatened him. Further, he
stated that on one occasion prior to
January 6, Mitchell pulled down Butera's
pants in front of other detainees,
slapped Butera's buttocks, and exclaimed
that Butera was going to be Mitchell's
"bitch." Butera testified that early in
the morning of January 6, he awoke to

find a towel wrapped around his face and his arms and legs being pinned down. He testified that Mitchell and Eskridge punched him several times and that Mitchell then inserted his penis into Butera's rectum. Butera stated that the assault lasted about ten minutes and that he could not scream out for help because of the towel that was wrapped around his face.

Butera testified that he had a conversation with some correctional officers approximately one week before the assault, during which he indicated that he was "having problems in the block" and needed to be removed from cellblock 2-I./1 In addition, Butera's mother Rena signed an affidavit averring that shortly before the assault, she spoke with a Jail employee over the telephone and told him that some detainees in cellblock 2-I had threatened to sexually assault Butera. Her affidavit did not identify the employee with whom she had spoken.

On the evening of January 6, Butera phoned his mother and told her about the assault. Rena, in turn, informed Jail personnel that Butera had been assaulted, and the Jail immediately transferred Butera out of cellblock 2-I. After being moved to a different cellblock, Butera was threatened by another detainee who was Mitchell's cousin. Butera reported this threat to Jail personnel and told them who had threatened him and what the specific threat was. Immediately thereafter, the Jail transferred him to yet another cellblock, where he remained until January 21, 1997.

B.  Jail Policies

Sheriff Cottey and his staff devised several policies for the protection of detainees that were in place at the time of Butera's assault. First, he instituted a classification scheme under which the Jail housed detainees. The Jail not only classified and assigned detainees by sex and age, but also by behavior. With respect to behavior, the Jail separated detainees with a history of violence from others. Cellblock 2-I housed males who had been arrested for violent crimes. The Jail also isolated detainees who exhibited extremely violent behavior and restricted their activities.

Jail policy also required correctional officers to make "clock rounds" through each cellblock at least once per hour in order to ensure detainee safety and prevent violence. During the clock rounds, the correctional officers approached the respective cellblock, spoke to the detainees, and determined whether any of them needed assistance. The policy provided that if a detainee informed Jail personnel that he was having a problem with another detainee and identified that detainee, one of the two detainees would be transferred to another cellblock.

In addition, "call cards" were available in every cellblock. Detainees could write a note to a correctional officer on a call card to request protection or identify a specific problem that they were having. Correctional officers picked up call cards every time that they were in a cellblock. In addition to their hourly rounds, correctional officers monitored each cellblock three times a day to distribute meals and pick up trays and utensils afterwards. At those times, detainees could approach the officers to request protection or report problems, or could place a call card on his meal tray for the correctional officer to pick up. Detainees were also able to leave their cellblocks every day for attorney visits, court dates, sick calls, or to attend Jail church services or school classes. During these times, correctional officers were present to respond to detainee requests or problems.

After his assault, Butera brought suit in the Southern District of Indiana, claiming that the Sheriff, knowing about an imminent and serious risk of harm to him, maintained detainee housing and protection policies that were inadequate. The district court granted summary judgment in favor of the Sheriff, holding that Butera had failed to present sufficient evidence to create a genuine issue of material fact.

II. Analysis

Butera makes two arguments on appeal for why the Sheriff should be held liable for his injury: (1) Butera and his mother gave the Sheriff, or at least Jail personnel, actual notice that he was in

danger and no one attempted to prevent the assault and (2) that despite generalized knowledge of an imminent and serious risk of harm to Butera, the Sheriff maintained policies that were inadequate to protect him from assault. The district court granted summary judgment in favor of the Sheriff with respect to both of Butera's arguments. We review a grant of summary judgment de novo, viewing all of the facts, and drawing all reasonable inferences therefrom, in favor of the nonmoving party. See Cent. States, Southeast and Southwest Areas Pension Fund v. White, 258 F.3d 636, 639 (7th Cir. 2001). Summary judgment should be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Cengr v. Fusibond Piping Sys., Inc., 135 F.3d 445, 450 (7th Cir. 1998) (quoting Fed. R. Civ. P. 56(c)). Because Butera was a pre-trial detainee and had not yet been convicted of a crime, his section 1983 claim is analyzed under the Fourteenth Amendment's Due Process Clause rather than under the Eighth Amendment's Cruel and Unusual Punishment Clause./2 See Frake v. City of Chicago, 210 F.3d 779, 781 (7th Cir. 2000). Accordingly, Butera is protected from the Sheriff's "deliberate indifference" to his safety. Id. A finding of deliberate indifference requires a showing that the Sheriff was aware of a substantial risk of serious injury to Butera but nevertheless failed to take appropriate steps to protect him from a known danger. See id. at 782. The Sheriff, however, was not required to ensure Butera's safety and "[t]he existence or possibility of other better policies which might have been used does not necessarily mean that the [Sheriff] was being deliberately indifferent." Id.

   Further, because the Sheriff is the defendant in this case, and not the individual correctional officers, Butera must show that "deliberate action attributable to the [Sheriff] directly caused a deprivation of federal rights." Id. at 781 (quotation omitted). This means that Butera must show that the Sheriff, and not just Jail employees, "made a deliberate choice among various

alternatives and that the injury was caused by the policy." Id. (quotation omitted). An unconstitutional custom or policy can take one of three forms:

(1) [A]n express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority.

See Brokaw v. Mercer County, 235 F.3d 1000, 1013 (7th Cir. 2000) (citation omitted). Both of Butera's arguments are "deliberate indifference" arguments--if the Sheriff had notice of a substantial risk of serious harm to Butera, either through actual notice given to him by Butera and his mother, or through the general conditions at the Jail, and hedevised no policies or devised inadequate policies to attempt to prevent the assault, he would be "deliberately indifferent" and Butera would prevail.

Butera first argues that the Sheriff, or at least Jail personnel, had actual notice of a specific threat to him and that no one attempted to prevent his assault. Butera relies heavily on the following conversation that he had with some correctional officers about a week before the assault:

Q: What exactly did you say to them?

A: I told them I was having problems in the block. And at the time I was scared and they asked me what kind of problems I was having and I just said I need [to be] removed, you know, because they weren't there to protect me. I just told them I was having problems and I needed [to be] removed and they said they couldn't do it.

. . .

Q: And what did they say?

A: They asked me why I needed off the block and I told them I needed off the block. And they said we can't pull you off the block.

Q: And that's all the information that you gave them?

A: Yeah.

Q: You didn't say why or who was bothering you?

A: No.

He also claims that Rena's phone call to the Jail put the Sheriff on notice of a risk of harm to Butera. However, neither of these communications was sufficient to give the Sheriff actual notice of a specific risk of serious harm so as to find the Sheriff deliberately indifferent for failing to take appropriate steps to prevent the assault. See Lewis v. Richards, 107 F.3d 549, 553 (7th Cir. 1997).

In Lewis, after the inmate plaintiff had been raped by two members of the Gangster Disciples gang, he reported the incident to prison officials and requested protection from those inmates who had raped him. See id. at 551. In response, the prison transferred him to another dormitory. See id. Before he was transferred, the plaintiff was also threatened by twenty gang members, but the plaintiff did not report this incident to the prison. See id. Two different inmates, both members of the Gangster Disciples, raped the plaintiff in the second dormitory. See id. at 551-52. Thereafter, the plaintiff sued the prison officials to whom he had allegedly reported the first rape, claiming that they were deliberately indifferent to the risk that the plaintiff would be raped a second time. See id. at 552. The district court granted summary judgment in favor of the defendants, and we affirmed. See id. at 552-53. We held that the prison officials were not deliberately indifferent because although the plaintiff had requested protection from the inmates who had raped him the first time, he had not "specifically [sought] protection from the two inmates who assaulted him on [the second] occasion [nor] identif[ied] the twenty gang members who threatened him after the first rape." Id. at 553. Therefore, the defendants were not deliberately indifferent because the plaintiff could not "demonstrate that defendants had specific knowledge of a threat to [the

plaintiff] by the inmates who assaulted him [on the second occasion]." Id. (emphasis added).

Butera's statements to the correctional officers that he "was having problems in the block" and "needed to be removed" were insufficient to give the Sheriff notice of a specific threat. Butera did not identify who had threatened him and what the threats were. Indeed, Butera did not even disclose in general terms that he was afraid of being assaulted. In fact, prior to summary judgment, Butera conceded that "prior to the assault on January 6, 1997, [he] did not report to Jack Cottey ("Cottey") or to any personnel at the Marion County Jail that he had been threatened or assaulted in cell block 2-I." Further, Butera testified that no correctional officer had seen Mitchell or Eskridge threaten him. As in Lewis, because Butera did not specifically seek protection from the detainees who had assaulted him and did not disclose the specific threats that Mitchell and Eskridge had made to him, he could not demonstrate that the Sheriff was aware of a substantial risk of injury to him. See id. Further, even if Butera could show that the correctional officers knew about a risk of harm to Butera, this is not enough, without more, to impute knowledge to the Sheriff. Cf. Williams v. Heavner, 217 F.3d 529, 532 (7th Cir. 2000) (noting that municipalities are not vicariously liable for constitutional torts).

For similar reasons, Rena's phone call to the Jail did not put the Sheriff on notice of a specific risk of harm to Butera. According to Rena's affidavit, she complained to an unidentified Jail employee about threats that some detainees in cellblock 2-I made to Butera. By mentioning that the threats concerned sexual assault, she provided more information than Butera did in his conversation with the correctional officers. Nevertheless, her complaint to an unidentified Jail employee concerning general threats of sexual assault by unnamed detainees did not put the Sheriff on notice of a specific threat of harm to Butera. See Lewis, 107 F.3d at 553. Further, Butera has presented no evidence that the person Rena spoke with was a policymaker. If she spoke with a mere employee as opposed to a policymaker,

Butera's claim against the Sheriff fails because, as discussed above, the Sheriff cannot be held liable under a respondeat superior theory. See Williams, 217 F.3d at 532. Therefore, with no evidence that a policymaker had notice of Rena's complaint, the fact that she called an anonymous employee does nothing to further Butera's claim against the Sheriff.

Butera also argues that even if the Sheriff did not know of the specific risk to him, the general conditions at the Jail put the Sheriff on notice that his detainee policies were inadequate. For example, he argues that sexual assaults (as well as murders and drug-related offenses) occurred so frequently at the Jail that there was a "systematic pattern of violence." He argues that this pattern of violence was so pervasive that the Sheriff was deliberately indifferent for maintaining the policies of housing all of the male, violent detainees in cellblock 2-I and of patrolling cellblock 2-I only once per hour.

In Frake, we addressed whether the pervasiveness of inmate suicides at Chicago detention facilities coupled with the fact that the City continued to detain people in cells with horizontal cross-bars amounted to "deliberate indifference." 210 F.3d at 782. In that case, Robert Frake, a pre-trial detainee at a Chicago detention facility, committed suicide by hanging himself from the horizontal cross-bars in his cell. See id. at 781. His father brought suit against the City of Chicago, claiming that the City knew about the substantial risk of detainees committing suicide, but still failed to take the appropriate preventative measure of removing the horizontal cross-bars from the cells. See id. The plaintiff argued that the number of suicides at Chicago detention facilities--20 suicides and 163 attempted suicides between December 1990 and November 1997--proved that the City was deliberately indifferent. See id. at 782-83. We rejected that argument, holding that:

We do not think that numbers can tell the whole story. It is possible that one or two suicides coupled with other evidence could add up to deliberate indifference in a proper case. The fact of an

unfortunate, but not outrageous, number of suicides, however, given other precautions which may be taken, might not . . . . Given the fact that the City took other precautions with detainees, we cannot find that the continued use of the cells as constructed equals deliberate indifference.

Id. at 783 (citations omitted). In so holding, we noted that the City did not have knowledge of Frake's suicidal tendencies and that the City took precautionary measures such as training their employees and checking the cells every fifteen minutes. See id.

To support his assertion that violence was so prevalent at the Jail as to put the Sheriff on notice of a substantial risk of serious harm to him, Butera relies on the deposition testimony of Detective Stephen Summers./3 Detective Sum-mers testified that between 1993 and 1997, he investigated about fifty fights between detainees and about ten to fifteen allegations of sexual assault. However, there is no evidence that any of the fights or incidents of sexual assault that Detective Summers investigated actually occurred, or if so, that they occurred in cellblock 2-I. In fact, contrary to Butera's position, correctional officer Francisco Gonzalez testified that he knew of no sexual assaults that occurred at the Jail in 1996 or 1997. Thus, Detective Summers' testimony, without more, does not support Butera's claim. See Strauss v. City of Chicago, 760 F.2d 765, 768-69 (7th Cir. 1985) (holding that complaints of unconstitutional activity standing alone do not establish pattern for section 1983 liability). Butera's claim fails because he has offered no evidence that any incident of sexual assault, other than his own, has ever occurred in cellblock 2-I. This flaw is fatal to Butera's claim in this context because he alleges that the Sheriff's policy of housing all of the male, violent detainees in one cellblock caused his injury.

Our conclusion is also supported by evidence that the Sheriff had taken precautionary measures against violence in the cellblocks. Major Steven Davis testified about the extensive training that Jail correctional officers undergo. For example, he testified that Jail

correctional officers attend a two-week specialized training course and receive yearly in-service training dealing with corrections issues such as detainee violence. Further, during the time period of Butera's assault, the correctional officers patrolled cellblock 2-I once per hour as well as during meals. During these times, the detainee could identify another detainee with whom he was having problems, and the Jail would transfer one of the detainees to another cellblock. If the detainee wanted to post an anonymous complaint, he could do so via a call card. Finally, the Jail separated the most violent detainees from the rest of the detainee population.

Butera argues that the Sheriff should have implemented different measures, such as placing 24-hour video surveillance cameras in the cellblocks. However, the "existence or possibility of other better policies which might have been used does not necessarily mean that the [Sheriff] was being deliberately indifferent." Frake, 210 F.3d at 782. Further, Butera claims that the existing policies were ineffective because due to fear of retaliation, detainees were loathe to snitch on each other and because detainees would conceal violent behavior by dimming cellblock lights or by hiding behind blankets draped over bunk beds. However, Butera has failed to show how the Sheriff's policies caused these activities because even if there were 24-hour video surveillance of the cellblocks, detainees could still dim the lights or hide under blankets. See Estate of Novack v. County of Wood, 226 F.3d 525, 530 (7th Cir. 2000) (noting that for plaintiff to prevail, he must show that the policy was the "direct cause" of or "moving force" behind the constitutional violation).

In sum, Butera has failed to show that the Sheriff had actual notice of a substantial risk of harm to him. Further, Butera has failed to show that prior to January 1997, any incident of sexual assault took place in cellblock 2-I. Finally, the Sheriff implemented precautionary measures to prevent detainee violence. The combination of these factors in this case means that the Sheriff was not deliberately indifferent. See Frake, 210 F.3d at 782.

III.  Conclusion

   For the foregoing reasons, the district court's grant of summary judgment is AFFIRMED.

FOOTNOTES

/1 The record is unclear as to whether this conversation involved only one correctional officer or several officers.

/2 As a practical matter, this distinction does not affect Butera's claim, as we have "held that sec. 1983 claims brought under the Fourteenth Amendment are to be analyzed under the Eighth Amendment test." Henderson v. Sheahan, 196 F.3d 839, 844 n.2 (7th Cir. 1999).

/3 Butera also relies on an order entered by Judge Dillin of the Southern District of Indiana. In that order, entered in May 1999, Judge Dillin considered whether to reimpose a population cap on the number of Jail detainees that was in effect at the time of Butera's assault, but that was terminated thereafter. Judge Dillin noted that violence amongst and against juvenile detainees occurred at the Jail and that the monitoring of the west wing of the Jail was deficient. However, despite this, Judge Dillin ruled against reimposing a limit on the number of people that could be detained at the Jail. This order does nothing to strengthen Butera's claim. First, Judge Dillin discussed Jail conditions as they existed in 1999, nearly two years after Butera's assault. Further, by holding that population caps were not necessary, if anything, the order supports the position that the Jail's housing policies were not deficient. Finally, although noting that the monitoring of cellblocks was deficient, Judge Dillin made no findings with respect to whether these deficiencies were the result of the Sheriff's policy or custom.