**Cynthia RAPIER, Individually and as Special Administrator of the Estate of Kevin Rapier, Deceased, Plaintiff,**

v.

**KANKAKEE COUNTY, ILLINOIS, Defendant.**

**No. 00–CV–2089.**

United States District Court, C.D. Illinois, Urbana Division.

May 30, 2002.

Mark R. McKenna, Esq., Christopher T. Hurley, Esq., Christopher T. Hurley & Associates, P.C., Chicago, IL, for Plaintiff.

Michael W. Condon, Esq., Michael D. Bersani, Esq., Hervas, Sotos, Condon & Bersani, Itasca, IL, for Defendant.

### *ORDER*

McCUSKEY, District Judge.

This case is before this court for ruling on the Motion for Summary Judgment (# 19) filed by Defendant Kankakee County (County). Following this court's careful and thorough review of the documents filed and the arguments of the parties, the County's Motion (# 19) is GRANTED.

### FACTS

Kevin Rapier was arrested on March 20, 1999, based upon charges of predatory sexual assault of a child and criminal sexual assault. The charges stemmed from Rapier's alleged sexual assault of his two step-

daughters. He was taken to the Kankakee County Detention Center (jail). An inmate medical screening form was completed. This form stated that Rapier was suicidal. According to Mike Downey, chief of corrections with the Kankakee County Sheriff's Department, Rapier informed the intake officer that he had previously attempted suicide. Rapier was placed in the special needs cell at the jail. This cell had previously been used as the "drunk tank" and was near the booking area of the jail.

Sheriff Timothy Bukowski, who was responsible for the operation of the jail, testified that sex offenders, inmates who may not be able to defend themselves and inmates who were considered at risk of suicide were considered "special needs" inmates and were placed in the special needs cell. The special needs cell was located in a corridor which had a lot of guard traffic and staff passing by the cell. There was a small observation window in the steel door to the special needs cell through which a guard could see into the cell. The door and window were not visible from the booking area. However, there was a narrow gap on the side of the door which allowed guards to visually observe a small portion of the special needs cell from the booking area. Bukowski and Downey testified that it was the policy at the jail to check on inmates in the special needs cell every 15 minutes. At the time Rapier was being held in the special needs cell, there was no log which documented the checks made on the inmates in the special needs cell.

On March 22, 1999, Rapier was seen by Nurse Kim Gartner. Gartner made a note of her visit with Rapier on his Medical Record. Gartner recorded that Rapier stated that he attempted suicide in 1998. She noted that Rapier still felt "depressed/suicidal." She stated that he needed continued monitoring and that she would call the Helen Wheeler Mental Health Center to make an appointment for Rapier. Based upon Gartner's recommendation, Rapier remained in the special needs cell. Gartner called the Helen Wheeler Center the morning of March 26, 1999, regarding setting up an appointment for Rapier.

In 1973, when the jail was built, it had a capacity of 106 inmates. However, on March 26, 1999, because of the double bunking of cells and the use of other rooms at the jail to hold inmates, the inmate capacity of the jail was 217. On March 26, 1999, the total number of inmates at the jail was 129. Seven officers were on duty that day. Kent Smith, a correctional officer, testified that he was working at the booking area of the jail on that day. He was the supervisor and was not assigned to any particular area of the jail. However, his primary location in the jail was in the booking area. Officer Carnahan was the correctional officer assigned to the ground floor of the jail, which included the special needs cell. Carnahan left the floor around 1:30 p.m. to conduct video court on another floor of the jail. At approximately 1:30 p.m., Smith spoke to Rapier. Rapier asked Smith if he could have a shower and Smith told Rapier he was too busy. Smith stated that he could see Rapier's eyes and face through the gap on the side of the door to the special needs cell. Rapier was the only inmate in the special needs cell at that time. Smith testified that, approximately 15 to 20 minutes later, he went to the special needs cell because an investigator with the public defender's office was there to see Rapier. Smith testified that he found Rapier hanging in his cell. Rapier had braided a rope using stuffing from his mattress and had secured it in the ceiling with a "stick" which looked like a piece of a wooden handle. Smith called for help and Randal Walling, the assistant chief of corrections, responded. Rapier did not have a pulse and was not breath-

ing. Smith called the fire department. Paramedics from the fire department arrived within a short time and attempted to revive Rapier. Rapier was pronounced dead at 2:23 p.m. Rapier had used soap to write an apology to his family in his cell. Jail officials were unable to determine how Rapier obtained the stick he used to hang himself.

On March 24, 2000, Plaintiff, Cynthia Rapier (Rapier's wife), individually and as special administrator of Rapier's estate, filed her Complaint (# 1) against Defendants, the County, Bukowski, Downey, Walling and Smith. Plaintiff alleged that the Defendants were liable under 42 U.S.C. § 1983 for the violation of Rapier's rights under the Fourteenth Amendment of the United States Constitution. Plaintiff alleged that the Defendants were deliberately indifferent to the risk of suicide by Rapier. On January 3, 2002, the parties filed a Stipulation (# 22) which stated that Plaintiff voluntarily dismissed Defendants Bukowski, Downey, Walling and Smith. These Defendants were therefore terminated as parties to this case.

On January 2, 2002, the County, the only remaining Defendant, filed its Motion for Summary Judgment (# 19), Memorandum of Law in Support (# 20) and Statement of Undisputed Facts (# 21) with attached documentation. The County argued that Plaintiff failed to establish an unconstitutional policy or practice on behalf of the County which can be said to be the proximate cause of Rapier's suicide. The County also argued that Plaintiff failed to establish that the County was deliberately indifferent to the risk of suicide by detainees through the implementation of any such policy or custom. The County argued that the jail's policy of checking on inmates in the special needs

cell every 15 minutes was more stringent than the Illinois County Jail Standards, which required that inmates be visually observed at least every 30 minutes. The County noted that there was no evidence that the County had experienced a prior suicide in the special needs cell. The County also noted that the allegations in Plaintiff's Complaint were inconsistent with her deposition testimony.[1] Plaintiff filed a Response to the Motion for Summary Judgment (# 23), a Response to the County's Statement of Undisputed Facts (# 24) and numerous exhibits. Plaintiff argued that the County was well aware that the jail was overcrowded, understaffed and that the special needs cell was improperly designed because it did not allow for constant visual monitoring of inmates. Plaintiff also argued that previous suicides by hanging had occurred at the jail. Plaintiff contended that, because the County did not act to correct its staffing problems, it acted with deliberate indifference to the risk of suicide by detainees. Plaintiff relied on the deposition testimony of Sheriff Bukowski in which he stated that he repeatedly advised the County Board that jail staff and detainees were at risk because of inadequate staffing levels, overcrowding and the poor design of the jail. Plaintiff also relied on various newspaper articles regarding conditions at the jail. In one newspaper article, Bukowski was quoted as stating he believed that having more staff at the jail could have prevented Rapier's suicide. In addition, Plaintiff relied on inspection reports prepared by the Illinois Department of Corrections. The reports from 1997 and 1998 stated that the level of staffing at the jail should be reviewed and increased if necessary. The report dated April 8, 1999, which was based upon an inspection

---

1. At her deposition, Plaintiff testified that she had talked to Rapier during his incarceration at the County jail and that it was her opinion that he was not depressed or suicidal. Plaintiff testified that it was her belief that the guards at the jail murdered Rapier.

which occurred on March 26, 1999, stated that the jail had insufficient personnel. Plaintiff also relied upon statements made by Richard Wade regarding conditions in the special needs cell. Wade was an inmate at the jail until February 1999 and was housed in the special needs cell for one month during his incarceration, beginning on July 14, 1998. On August 29, 1998, Wade sent a letter to Downey. In his letter to Downey, Wade complained about conditions in the special needs cell including the lack of regular monitoring of the inmates in the cell. Wade stated that there were usually periods of at least four hours when no one checked on the inmates in the special needs cell.

The County filed a Reply Memorandum (# 25) and a Reply to Plaintiff's Statement of Additional Facts (# 26) with additional documents. The County argued that the use of the special needs cell was a reasonable and effective way to prevent detainee suicides, and such use alone cannot constitute deliberate indifference. The County also argued that there was no evidence to show that the jail was understaffed on March 26, 1999, when there were seven officers on duty and the total number of inmates was 129. The County noted that the Illinois County Jail Standards do not require constant visual monitoring of inmates, including those determined to have special needs. The County attached a copy of the Illinois County Jail Standards which were in effect in March 1999. These standards state that a "jail officer shall provide personal observation, not including observation by a monitoring device, at least once every 30 minutes." The County argued that Wade's letter was not evidence of any deliberate indifference on the part of the County. In support of this argument, the County attached a copy of a portion of the deposition of Richard Wade. Wade stated that he had no knowledge of conditions at the jail after he left the jail on February 10, 1999. The County also

contended that the newspaper articles relied on by Plaintiff were inadmissible hearsay. The County further noted that, at his deposition, Bukowski testified that the quote attributed to him was taken out of context and that there is no legal requirement to have a guard positioned in every cellblock every minute of every day. Bukowski also testified that, as far as Rapier's suicide, they had seven people working that day and the census was lower than usual and he did not "think that having additional staff may have made a tremendous difference."

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, a plaintiff must respond to the defendant's motion with evidence setting forth specific facts showing that there is a genuine issue for trial. *Michael v. St. Joseph County,* 259 F.3d 842, 845 (7th Cir.2001). A genuine issue for trial "exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Michas v. Health Cost Con-*

*trols of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir.2000), *quoting Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir.1999). In making this determination, the court must consider the evidence in the light most favorable to the party opposing summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, to successfully oppose a motion for summary judgment, a plaintiff must do more than raise a "metaphysical doubt" as to the material facts, and instead must present definite, competent evidence to rebut the motion. *Michael*, 259 F.3d at 845. To survive summary judgment, the nonmovant must make a showing sufficient to establish any essential element for which he will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *see also Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir.1999).

## II. COUNTY'S MOTION

■ In this case, Plaintiff alleges that the County is liable under 42 U.S.C. § 1983 because the County was deliberately indifferent to the risk of Rapier's suicide and so deprived him of his life without due process of law. *See Boncher v. Brown County*, 272 F.3d 484, 485 (7th Cir.2001). For liability to attach against a municipality under 42 U.S.C. § 1983, a plaintiff must show that "deliberate action attributable to the municipality directly caused a deprivation of federal rights." *Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir.2000), *quoting Board of County Comm'rs v. Brown*, 520 U.S. 397, 415, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Because Rapier was a pretrial detainee and had not yet been convicted of a crime, his § 1983 claim is analyzed under the Fourteenth Amendment's Due Process Clause rather than under the Eighth Amendment's Cruel and Unusual Punishment Clause. *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir.2002). But, like the protection afforded a convicted prisoner under the Eighth Amendment,

a pretrial detainee is protected from the "deliberate indifference" of officials. *Frake*, 210 F.3d at 781, *citing County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), *see also Anderson v. Templeton*, 2002 WL 226882, at *2 (N.D.Ill.2002).

■ Deliberate indifference is more than negligence and approaches intentional wrongdoing. *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir.1998). A finding of deliberate indifference requires a showing that the County was aware of a substantial risk of serious injury to the detainee but nevertheless failed to take appropriate steps to protect him from a known danger. *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir.2002); *Frake*, 210 F.3d at 782; *see also Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "A municipality may be liable for harm to persons incarcerated under its authority 'if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners.'" *Estate of Novack v. County of Wood*, 226 F.3d 525, 530 (7th Cir.2000), *quoting Payne v. Churchich*, 161 F.3d 1030, 1043 (7th Cir. 1998), *cert. denied*, 527 U.S. 1004, 119 S.Ct. 2339, 144 L.Ed.2d 236 (1999). "A defendant is not, however, required to guarantee the detainee's safety. The existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent." *Frake*, 210 F.3d at 782; *see also Butera*, 285 F.3d at 605. In order to prevail on her claim, Plaintiff must show that the County "made a deliberate choice among various alternatives and that the injury was caused by the policy." *Butera*, 285 F.3d at 605; *see also Frake*, 210 F.3d at 781, *citing Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Plain-

tiff must show that the policy was the "direct cause" of or "moving force" behind that constitutional violation. *Butera,* 285 F.3d at 609, *citing Estate of Novack,* 226 F.3d at 530–31.

As noted previously, the County argues that Plaintiff cannot establish that any general allegations of overcrowding, improper design of the jail or inadequate staffing were sufficient to show deliberate indifference on the part of the County. The County also argues that Plaintiff cannot show that overcrowding, improper design or inadequate staffing were the direct cause of Rapier's suicide. In response, Plaintiff argues that Rapier reported that he had a history of a prior suicide attempt and that he might still be suicidal. Plaintiff contends that the County was deliberately indifferent to this known risk because the "jail lacked the staff or facilities to place Mr. Rapier under direct visual observation."

█ When a state actor such as the County deprives a person of his ability to care for himself by incarcerating him or detaining him, it assumes an obligation to provide some minimum level of wellbeing and safety. *See Collignon,* 163 F.3d at 987. Therefore, case law has held that jailers must make efforts to prevent obviously suicidal detainees from committing suicide. *See Proffitt v. Ridgway,* 279 F.3d 503, 506 (7th Cir.2002), *citing Jutzi–Johnson v. United States,* 263 F.3d 753, 756 (7th Cir.2001). "Jail managers who decided to take no precautions against the possibility of inmate suicide—to have no policy, for example no suicide-watch option—would be guilty of deliberate indifference in the relevant sense." *Boncher,* 272 F.3d at 486.

█ In this case, it is not disputed that it was the policy at the jail to place poten-

tially suicidal detainees in the special needs cell. Also, it was the policy at the jail to require checks of detainees in the special needs cell every 15 minutes. This evidence therefore shows that the County had implemented precautionary measures to prevent suicide by detainees. *See Butera,* 285 F.3d at 609. Plaintiff argues that the use of the special needs cell was inadequate because inmates in the cell could not be observed from the booking area and could only be seen by walking to the door of the cell and looking in the window on the door. However, there is no evidence that any detainee housed in the special needs cell had ever committed suicide prior to Rapier's suicide.[2] Moreover, while Plaintiff has discussed a prior suicide at the jail in 1991, Plaintiff presented no statistical evidence to support her conclusory argument that a suicide problem existed at the jail prior to March 26, 1999. *See Boncher,* 272 F.3d at 486–87. This court concludes that the County could reasonably believe that its policy of placing potentially suicidal detainees in the special needs cell, along with its policy to require checks of these inmates every 15 minutes, was an effective way to prevent suicide by detainees. This court therefore concludes that Plaintiff has not raised a genuine issue of material fact regarding whether the County's policy of placing potentially suicidal detainees in the special needs cell showed deliberate indifference on the part of the County.

Plaintiff also argues that a genuine issue of material fact exists regarding whether understaffing at the jail, of which County officials were well aware, caused Rapier's suicide. Plaintiff relies heavily on newspaper articles in which various jail officials, including Sheriff Bukowski, were quoted as stating that the jail was understaffed

2. Walling testified that he successfully prevented a suicide from occurring in the special needs cell at some time prior to Rapier's suicide.

and that this could have contributed to Rapier's suicide. This court notes that the County may well be correct that many of the articles relied on have not been authenticated and are, therefore, inadmissible hearsay. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742–43 (7th Cir.1997). In any case, in all of the articles, the speaker was expressing an opinion which could only be based upon speculation. In fact, Sheriff Bukowski stated at his deposition that, as far as Rapier's suicide, they had seven people working that day and the census was lower than usual and he did not "think that having additional staff may have made a tremendous difference."

■ The undisputed evidence in this case shows that Smith spoke to and saw Rapier 15 to 20 minutes prior to the time he was found hanging in the special needs cell. This court must conclude that Plaintiff's argument that additional staff at the jail could have prevented Rapier's suicide is couched in terms of rather remote possibility, not substantial probability. *See Anderson*, 2002 WL 226882, at *3. The causal link between an alleged constitutional deprivation and official action must be more concrete. *Anderson*, 2002 WL 226882, at *3; *citing Jutzi–Johnson*, 263 F.3d at 756–58. The relevant causation inquiry is whether Rapier's suicide was a foreseeable consequence of the failure of the County to adequately deal with the problem of understaffing at the jail. *See Jutzi–Johnson*, 263 F.3d at 756. This court concludes that it would have to engage in speculation to determine that additional staff at the jail would have resulted in Rapier being checked more often when the undisputed evidence showed that he had been observed by Smith, at most, 20 minutes prior to the time he was found hanging in the special needs cell. Accordingly, this court concludes that Plaintiff has not raised a genuine issue of material fact regarding whether understaffing at the jail was the "direct cause" of Rapier's suicide.

This court therefore concludes that the County is entitled to summary judgment. Plaintiff has not raised a genuine issue of material fact which might lead to a conclusion that the County maintained a policy which was deliberately indifferent to the risk to suicidal detainees such as Rapier. *See Frake*, 210 F.3d at 782. The death of Rapier was clearly a tragedy. However, the record shows as a matter of law that the County was not deliberately indifferent to his welfare. Accordingly, the County's Motion for Summary Judgment (# 19) is GRANTED.

IT IS THEREFORE ORDERED THAT:

(1) The County's Motion for Summary Judgment (# 19) is GRANTED. Judgment is entered in favor of the County and against Plaintiff.

(2) This case is terminated. The parties shall be responsible for their own court costs.