In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 06-2572

ROBERT KLEBANOWSKI,

*Plaintiff-Appellant*,

*v.*

MICHAEL F. SHEAHAN, Sheriff,
CALLIE BAIRD, HENRY TROKA, et al.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 5878—**Virginia M. Kendall**, *Judge.*

_____

ARGUED DECEMBER 7, 2007—DECIDED SEPTEMBER 2, 2008

_____

Before EASTERBROOK, *Chief Judge*, and MANION and
KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* While being held as a pre-trial
detainee in the Cook County Jail on a murder charge,
Robert Klebanowski suffered two attacks at the hands
of his fellow prisoners. Klebanowski claims that his
attackers were gang members. Asserting that prison
officials were deliberately indifferent to the risks caused
by housing an armed gang population with non-gang
members and periodically leaving them unsupervised,
Klebanowski filed suit pursuant to 42 U.S.C. § 1983 alleg-

ing a violation of his Fourteenth Amendment rights. The district court concluded that there was no evidence showing that any of the defendants was deliberately indifferent to a known risk of substantial harm to Klebanowski, and granted the defendants' motion for summary judgment disposing of the case. Klebanowski appeals, asserting that there exist genuine issues of material fact regarding the risk he was subject to, and the policies and conduct of the defendants in the face of that risk. We affirm.

I.

Robert Klebanowski was arrested on February 7, 2002, and charged with armed robbery and felony murder. *People v. Klebanowski*, 852 N.E. 2d 813, 815 (Ill. 2006).[1] While awaiting trial, Klebanowski was held at Division 11 of the Cook County Jail. Division 11 is a maximum security facility, and Klebanowski was held on the Division's BC tier, which housed accused murderers and had a high concentration of gang members. Klebanowski denies ever having been affiliated with a gang. On September 8, 2002, while in the day room with the rest of the inmates

---

[1]  These charges arose from a botched attempt by Klebanowski's associate, Robert Winters, to rob an off-duty lieutenant with the Chicago police department, Gary Szparkowski. *Id.* at 815-16. Klebanowski drove Winters to Szparkowski's house, and waited as the get-away driver. Winters took Szparkowski's wallet from him in the driveway of his house, but Szparkowski shot and killed Winters before he was able to get away. Klebanowski was convicted of both charges following a bench trial, and was sentenced to 20 years' imprisonment for the felony murder charge. *Id.* at 817.

on the tier, Klebanowski was approached by three gang member inmates known as Little E, Count, and Yo-Yo. They told Klebanowski they wanted a monthly payment of twenty dollars from him in return for their protection. When Klebanowski refused their offer, they pushed him into an open cell and began to beat him. Following the beating, Little E, Count, and Yo-Yo told Klebanowski that they would beat him again whenever he refused to pay them. They also told him they would kill him if he said anything to the guards.

Following the attack, Klebanowski waited in his cell for an officer to secure the inmates at the close of the recreation period. While the exact nature of Klebanowski's injuries is not set forth in the record, they were serious enough for the officer who came to close his cell to ask what happened to him. Fearing for his safety, Klebanowski told her he slipped in the shower. Klebanowski's condition caused the officer to doubt his explanation, but she said she would record his statement as given, and she then took him to the health care unit. Klebanowski was eventually sent to an outside hospital for stitches on his ear.

Upon his return to the BC tier later that day, Klebanowski approached a small group of correctional officers congregated on his tier and requested that he be moved to another location in the jail because he feared for his life. The officers told Klebanowski they knew what had happened to him, but that it would not help to move him because the conditions were the same wherever he could be moved. Later that evening, Klebanowski approached another officer and again asked to be moved for fear for his life. According to Klebanowski, this officer told him he would not be moved because there

was no room anywhere else. The officer also allegedly told Klebanowski that no one was moved on Sundays, which day it happened to be, and that he did not feel like doing any extra paperwork.

At about 9:15 p.m. on the following day, the correctional officer working Klebanowski's unit announced that he was going to open the cells and allow the inmates a few minutes of free time before the 9:30 p.m. inmate count and lockdown. The officer also allegedly announced that after he opened the cells he would be leaving the deck, and would return in a few minutes. Klebanowski exited his cell, and while he was watching television, Little E, Count, and Yo-Yo approached him from behind, and began to beat him again. This time, however, Count pulled out a homemade knife, or "shank," that he had concealed in his pants and stabbed Klebanowski on the left side of his stomach. Klebanowski was stabbed two more times while being beaten, although he was unable to see who stabbed him. Klebanowski escaped, and he jumped over a railing from the top deck on which they were fighting to a lower deck. As he jumped over the rail, Count stabbed him again in the back of the head. Klebanowski claims that once he reached the bottom deck, he ran to an exit and pressed a panic button. There was no response for five minutes following Klebanowski's alarm, and he continued trying to evade Little E, Count, and Yo-Yo. Klebanowski claims that correctional officers finally entered the deck after he waved at them through a large window. The officers ordered the prisoners into their cells. After learning of the nature of the attack on Klebanowski, officers searched all of the cells on the tier and uncovered fourteen shanks. Klebanowski spent two days in the hospital and had

his spleen removed as a result of the injuries he sustained during the attack.

Klebanowski filed suit in the district court on September 8, 2004. His original complaint stated claims against Cook County Sheriff Michael Sheahan, Department of Corrections Director Callie Baird, Baird's predecessor Ernesto Velasco,[2] Superintendent of Division 11 Henry Troka, as well as "Unknown Corrections Officers 1, 2 & 3." Klebanowski filed an amended complaint on May 9, 2005, adding as a defendant correctional officer Clifford Smith.[3] Finally, in his second amended complaint filed July 14, 2005, Klebanowski named as defendants correctional officers William Scott, Jermaine Smith, and Rafael Trevizo to replace the three unknown officers sued in his earlier complaints. Sheahan, Baird, and Troka were sued in their official capacities, and Scott, Smith, and Trevizo were sued individually. Klebanowski brought suit under 42 U.S.C. § 1983 claiming that in three ways the defendants violated his rights as protected by the Fourteenth Amendment: (1) by allowing his wing in Division 11 to be controlled by gang members and by not separating gang members from non-gang members; (2) by allowing gang members to keep weapons in their cells; and (3) by leaving inmate wings entirely unsupervised regularly for significant periods of time. Klebanowski alleged that these were "de facto" policies of the defendants.

---

[2] Klebanowski voluntarily dismissed Ernesto Velasco on February 9, 2005.

[3] Klebanowski ultimately dismissed his claim against Clifford Smith in his response to the defendants' motion for summary judgment after concluding that he was not involved in the events giving rise to this suit.

The defendants moved for summary judgment arguing that they had not deliberately disregarded any known risk to Klebanowski. The parties' submissions to the district court consisted of Klebanowski's deposition describing the circumstances of his attacks, Cook County Jail rules and regulations governing detainees, a copy of the correctional officers' job description, the statements of individual officers obtained during an investigation of the second attack, and an Incident Report compiled by the Cook County Sheriff's Department following the second attack. The district court granted summary judgment in favor of the defendants. Regarding Sheahan, Baird, and Troka, the district court concluded that Klebanowski presented no evidence of a policy, let alone a policy of deliberate indifference to a known risk to Klebanowski. The district court also concluded that the officers sued in their individual capacities were not on notice of a specific threat to Klebanowski, and therefore had not disregarded any known risk. On appeal, Klebanowski argues that there existed genuine issues of material fact regarding whether the conditions of his incarceration posed a substantial risk of serious harm, and whether the defendants acted with deliberate indifference to that risk.

II.

We review the district court's grant of summary judgment de novo and draw all reasonable inferences in Klebanowski's favor. *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002). A motion for summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact." Fed. R. Civ. P. 56(c). However, a "[p]laintiff may not rely *only* on the bare

assertions of his pleadings." *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 651 (7th Cir. 2006) (citing Fed. R. Civ. P. 56(e)) (emphasis added).

Because the events described above occurred while Klebanowski was a pre-trial detainee, he correctly states his claims under the Due Process Clause of the Fourteenth Amendment. *Guzman v. Sheahan*, 495 F.3d 852, 856 (7th Cir. 2007). "The protections for pre-trial detainees [under the Fourteenth Amendment] are at least as great as the Eighth Amendment protections available to a convicted prisoner, and we frequently consider the standards to be analogous." *Washington v. LaPorte County Sheriff's Dep't*, 306 F.3d 515, 517 (7th Cir. 2002) (quotation and citation omitted). It is well-settled that both Amendments impose upon prison officials a duty to protect inmates from violent assaults at the hands of fellow prisoners. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *see also Fisher v. Lovejoy*, 414 F.3d 659, 661 (7th Cir. 2005) (noting that the Fourteenth Amendment extends this protection to pre-trial detainees). An official violates that duty "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

Turning first to the claims against Sheahan, Baird, and Troka, we recall that "[a]n official capacity suit is tantamount to a claim against the government entity itself." *Guzman*, 495 F.3d at 859. Klebanowski must therefore establish that the deliberate indifference to which he was subjected came about as a result of a custom or policy established by the officials. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 650, 690-91 (1978); *see also Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir. 2000) ("A

plaintiff must show that municipal policymakers made a deliberate choice among various alternatives and that the injury was caused by the policy.") (quotation omitted). Three forms of unconstitutional policies or customs are recognized in this context:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority.

*Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003) (quotation and citation omitted).

Klebanowski does not expressly invoke one of these three policy types, arguing only that his attacks were brought on by the three "de facto" policies of housing gang members with non-gang members, allowing them weapons, and periodically leaving them unattended. However, the evidence in the record is insufficient to establish the existence of any of the three types of policies articulated in *Palmer*. Klebanowski submitted no evidence showing an express endorsement of the policies he claims caused his injuries. Likewise, he offered no evidence that any policymaker caused the circumstances of which he complained, assuming those circumstances were actually present in the jail.

Therefore, in order to succeed on his claims against Sheahan, Baird, and Troka, Klebanowski needed to show that the "de facto" policies he alleged were widespread practices in the jail. The only pieces of evidence

that would be material to showing a widespread practice are Klebanowski's deposition wherein he describes his attacks, and the Incident Report which revealed that fourteen shanks were recovered after the cell search. However, this evidence, standing on its own, is insufficient to establish the existence of a widespread practice. *See Palmer*, 327 F.3d at 596 ("When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference."). The record contains no evidence of any attacks other than the two inflicted on Klebanowski. Additionally, Klebanowski stated during his deposition that he told officers on two occasions he would like to be moved because he feared for his life, but he never told those officers that he was being targeted by gang members because of his non-gang member status. It was only later when he filed his grievance that he disclosed the facts of his assault by identifying his attackers and their gang membership. There is, however, nothing in the record indicating that the prison officials had notice that gang members were targeting non-gang members at the time Klebanowski was attacked.

Regarding the fourteen shanks discovered following the cell search, Klebanowski asserts that their presence indicates a policy of not conducting regular searches because that number of homemade knives "does not show up overnight." However, to raise a genuine issue of material fact, Klebanowski would need some further evidence to support his assertion that finding fourteen shanks in a search is indicative of an official policy of deliberate indifference. The record is silent regarding

the frequency with which searches were conducted, the nature and availability of the materials from which shanks are made, the time it takes to fashion a shank, and the official defendants' knowledge of any of those factors. Likewise, assuming the inmates were left unattended on the night of September 9 for the duration of time Klebanowski states they were, there is no evidence suggesting that they were similarly left unattended any other time.

As the district court noted, Klebanowski "has produced no evidence about any incident other than his own, . . . about any knowledge on the part of any official about general gang affiliation in the jail, or about any steps taken or not taken to prevent violence between gang members and non-gang members in the jail." We agree with the district court, and conclude more broadly that there is no evidence indicating that Sheahan, Baird, or Troka enacted or otherwise facilitated any of the three "de facto" policies alleged by Klebanowski. Accordingly, the district did not err in entering summary judgment in their favor.

As they did before the district court, the defendants argue that Klebanowski's claims against the individual defendants are time-barred because he was attacked in September 2002, but did not identify the correctional officers he believed were deliberately indifferent until the filing of his second amended complaint on July 14, 2005. Under normal circumstances, the defendants' argument would be meritorious. Klebanowski's claims would not relate back to the date he initiated this action because he did not then know the identity of the officers. *Worthington v. Wilson*, 8 F.3d 1253, 1257 (7th Cir. 1993). The statute of limitation for his claims is two years and he

did not name (and thus notify) the individual defendants within that time period. *See* 735 ILCS 5/13-202; *see also King v. One Unknown Fed. Corr. Officer*, 201 F.3d 910, 913 (7th Cir. 2000) (noting that the statute of limitations for § 1983 actions is determined by the statute of limitations for personal injury actions in the state where the incident occurred).

Here, however, Klebanowski claims to have filed a prison grievance on September 18, 2002, and another one three months later as a form of appeal because he was dissatisfied with the disposition of the first. After hearing nothing for almost two years, he filed this action on September 8, 2004. The defendants did not contest Klebanowski's description of the status of the grievance process. This could be a problem for them because the Illinois statute of limitations is tolled during the pendency of those proceedings. *Johnson v. Rivera*, 272 F.3d 519, 522 (7th Cir. 2001). Klebanowski's factual assertions regarding his grievance are the only such facts in the record. Because we take them as true, they might raise new issues not addressed by the parties. Did Klebanowski actually complete the grievance process when he did not receive a disposition? Was a grievance process even available to Klebanowski given the inordinate time he alleges passed without receiving a disposition? *See* Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) (imposing on prisoners a duty to exhaust administrative remedies only where those remedies are "available").

We need not resolve these issues. We may affirm summary judgment on any basis supported in the record. *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 681 (7th Cir. 2007). Like the district court, we will bypass the statute of limitations questions and consider the merits

of Klebanowski's claims against the individual defendants. To establish deliberate indifference on the part of the defendants sued individually, Klebanowski needed to show that the officers acted with the equivalent of criminal recklessness, in this context meaning that they were actually aware of a substantial risk of harm to Klebanowski's health or safety, yet failed to take appropriate steps to protect him from the specific danger. *Guzman*, 495 F.3d at 857. Klebanowski testified during his deposition that he told officers twice on September 8 that he was afraid for his life and he wanted to be transferred off the tier. Those statements, and the officers' knowledge of the first beating, are the only pieces of evidence in the record that can assist Klebanowski in his attempt to show that the officers were aware of any risk to him. We have previously held that statements like those made by Klebanowski are insufficient to alert officers to a specific threat. *Butera*, 285 F.3d at 606 (deeming insufficient to establish deliberate indifference statements by a prisoner that he was "having problems in the block" and "needed to be removed"). In *Butera*, we deemed the inmate's statements insufficient to give notice to the officers because they did not provide the identities of those who threatened the inmate, nor state what the threats were. *Id.*

The facts of this case make clear our reason for requiring more than general allegations of fear or the need to be removed. By Klebanowski's own testimony, the officers knew only that he had been involved in an altercation with three other inmates, and that he wanted a transfer because he feared for his life. He did not tell them that he had actually been threatened with future violence, nor that the attack on September 8 was inflicted

by gang members because of his non-gang status.[4] With-
out these additional facts to rely on, there was nothing
leading the officers to believe that Klebanowski himself
was not speculating regarding the threat he faced out of
fear based on the first attack he suffered. This lack of
specificity falls below the required notice an officer must
have for liability to attach for deliberate indifference.
Because the officers did not have notice of a specific
threat to Klebanowski, the district court did not err
in concluding that they were not deliberately indifferent
to a risk posed to him, and it correctly entered sum-
mary judgment in their favor.

III.

We conclude that Klebanowski failed to put forth any
evidence creating a genuine issue of material fact re-
garding the defendants' liability for deliberate indiffer-
ence to his rights. First, there was no indication that
the defendants sued in their official capacities were
responsible for policies that subjected Klebanowski to a
substantial risk of harm. Second, there is no evidence
indicating that the defendants who were sued in their
individual capacities were aware of a substantial risk of
harm to Klebanowski. The defendants were entitled to

---

[4] Because he is the non-moving party, we accept as true
Klebanowski's assertion that the attacks were gang-related,
even though there was nothing about his interactions with
Count, Yo-Yo, and Little E indicating that they targeted
him because he did not belong to a gang. Later on he indicated
that the first beating occurred because he refused to pay
them twenty dollars for "protection."

summary judgment on Klebanowski's claims, and the district court's entry of judgment in their favor is therefore AFFIRMED.