In the

# United States Court of Appeals

### For the Seventh Circuit

No. 02-2267

RONALD PALMER,

*Plaintiff-Appellant,*

*v.*

MARION COUNTY, CITY OF INDIANAPOLIS,
and SHERIFF JACK COTTEY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP 99-1020-C-B/S—**V. Sue Shields**, *Magistrate Judge.*

ARGUED DECEMBER 11, 2002—DECIDED MAY 1, 2003

Before COFFEY, EASTERBROOK, and DIANE P. WOOD,
*Circuit Judges.*

COFFEY, *Circuit Judge.* Plaintiff Ronald Palmer
("Palmer") appeals the district court's grant of summary
judgment disposing of his lawsuit against the City of
Indianapolis, Marion County (Indiana), and Sheriff Jack
Cottey. Palmer brought this claim under 42 U.S.C. § 1983,
alleging injuries resulting from violations of his constitu-
tional rights. In addition, Palmer claims that the defen-
dants negligently trained, hired, and supervised correc-
tional officers under Indiana law. The court's granting of
the defendants'-appellees' motion for summary judgment
was proper, for there is no genuine issue of fact dealing

with the question of whether the defendants adopted a pattern, custom, or policy of an unconstitutional nature. We affirm.

## I.  BACKGROUND

Because this is an appeal from summary judgment, this Court views the facts in the light most favorable to Palmer. *Lewis v. Richards*, 107 F.3d 549, 551 (7th Cir. 1997). In 1996 Palmer, a 23-year-old African American, was arrested and charged with bank robbery and held as a probation violator for a previous crime. The arrest constituted a violation of his current probation status for a prior auto theft conviction in Marion County. In November 1996, Palmer was transferred from the Boone County Jail to the Marion County Jail to await a hearing on the probation violation. On August 11, 1997, a fight ensued and Palmer was attacked by a group of inmates belonging to a gang known as the Gangster Disciples. During the altercation, Palmer was hit on the back of his head with a door handle and struck several times with fists, but admittedly suffered no injuries warranting treatment. When queried by correctional officers as to the identity of his assailants, Palmer initially refused to reveal their names out of fear of being labeled a "snitch." After being assured by jail guards that he would be moved to another part of the jail for his safety, Palmer identified his assailants by their nicknames.[1]

Shortly after identifying his assailants Palmer was placed in the reclassification cell, and the next day he was relocated to Cell Block 2T, located adjacent to Cell Block 2W.

---

[1] Although Palmer only knew his assailants by their nicknames, he claims that the officers knew the identities of the inmates in which he referred.

Upon discovering that he had been reassigned to Cell Block 2T, Palmer told the correctional officers escorting him that he could not be placed in 2T because he had been involved in a gang-related incident and Palmer was in fear that other members of the Gangster Disciples were presently confined in 2T. Furthermore, Palmer knew from experience that the inmates in Cell Blocks 2T and 2W were in contact with one another. Accordingly, Palmer was afraid that members of the Gangster Disciples in 2T would retaliate against him for having identified his attackers in the Cell Block 2W incident the previous day. One officer acknowledged remembering the incident to which Palmer referred and another officer offered Palmer the choice of confinement in 2T or solitary confinement ("deadlock"). Initially Palmer requested to be taken to deadlock, but after the officer insisted that the gang members had been relocated away from Cell Block 2T and promised that if anything happened the prison officers would promptly respond, Palmer agreed to transfer to 2T.

While approaching 2T, Palmer recognized familiar faces. After again expressing his concern, Palmer hesitantly entered the cell block with the intention of staying only a couple of minutes before reporting a problem necessitating his transfer. Palmer entered an empty room in the cell block and was looking through his personal belongings when another inmate entered the room and asked him if his name was Ron and also had he just come from 2W. Palmer denied that his name was Ron and stated that he had neither been incarcerated in 2W nor had he been involved in an altercation with the Gangster Disciples. The inmate accused Palmer of lying and left the room. Palmer attempted to hurriedly organize his possessions and was about to dart out the door to call for intervention, when he was pushed back in the room and surrounded by roughly ten inmates. The other inmates closed the cell door behind them and accused Palmer of being a snitch. Palmer's pleas

to be released were ignored and, after threatening Palmer for a short period of time, the other inmates attacked him, brutally beating and punching him as well as stabbing him with the sharp end of a broken broom handle. Palmer was backed up against a wall and eventually knocked to the floor, at which point the other inmates stomped on him until he lost consciousness.

When he awoke there was blood everywhere, the door to the room was locked shut, and cardboard had been placed over the door's window to keep correctional officers from seeing what was inside. When Palmer kicked at the door for help, another inmate entered the room and told Palmer that if he kicked the door again, the inmate would kill him. When that inmate left, others returned with towels and ordered Palmer to clean the blood up. Palmer was so weak he was unable to stand. The other inmates kicked him a few more times then left the room and Palmer again passed out. Palmer was discovered the next day by an inmate not involved in the assault. When correctional officers entered Cell Block 2T to remove Palmer, they discovered another beaten detainee in a different room of the cell block who had been held hostage at least a day longer than Palmer. One of the jail's medical personnel examined Palmer and concluded that Palmer needed immediate hospitalization. Palmer was hospitalized for about four days and thereafter returned to the Marion County Jail and assigned to the medical block before being transferred to another correctional facility. The inmates who were allegedly involved in the beating were later prosecuted.

In June 1999, Palmer filed suit in the Marion County Superior Court, alleging that the City of Indianapolis, Marion County, and Sheriff Jack Cottey—in both his individual and official capacity—violated Palmer's constitutional rights because they were deliberately indifferent to Palmer's safety by adopting a widespread practice of

segregating inmates by race as well as by failing to safeguard the health and well-being of the inmates from attacks thrust upon them by other detainees. Palmer also alleged federal civil rights and Indiana state law claims against the defendants for negligently hiring and failing to properly train and supervise correctional officers. Palmer did not name as defendants the individual correctional officers who were allegedly involved in exposing him to a serious risk of harm but did allege that these unnamed defendants violated his constitutional rights by failing to take the necessary precautionary steps to protect him after being advised of the dangers. The defendants removed the suit to federal court and after a hearing the court granted summary judgment in favor of the defendants on all of Palmer's claims ruling that Palmer had failed to demonstrate that either an unconstitutional policy of the defendants existed or that it was because of such a policy that he was attacked and suffered serious injury.

## II. DISCUSSION

"[T]his court reviews a grant of summary judgment *de novo*, viewing all of the facts and drawing all reasonable inferences therefrom in favor of the nonmoving party." *Cent. States, Southeast & Southwest Areas Pension Fund v. White*, 258 F.3d 636, 639 (7th Cir. 2001). "Summary judgment is proper where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 450 (7th Cir. 1998) (quoting Fed. R. Civ. P. 56(c)). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or

unnecessary will not be counted.'" *Abrams v. Walker*, 307 F.3d 650, 653 (7th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Palmer claims that defendants are liable under 42 U.S.C. § 1983 because they deprived Palmer of rights secured by the United States Constitution. In particular, Palmer claims the defendants violated his rights under the Eighth Amendment's Cruel and Unusual Punishment Clause as incorporated into the Fourteenth Amendment. The defendants argued and the court concluded that Palmer's claims arose under the Fourteenth Amendment's Due Process Clause because he was a pretrial detainee as opposed to a convicted prisoner. *See Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002) ("Because [plaintiff] was a pretrial detainee and had not yet been convicted of a crime, his section 1983 claim is analyzed under the Fourteenth Amendment's Due Process Clause rather than under the Eighth Amendment's Cruel and Unusual Punishment Clause."). The confusion about the constitutional predicate for Palmer's claims arises from the uncertainty as to whether a detainee awaiting a hearing on a probation violation can be "punished" under the Eighth Amendment. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (noting the "uncertainty about whether [a detainee awaiting a hearing on a probation violation] was a pretrial detainee or a convicted prisoner"). "[T]he state does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977); *see also Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[U]nder the Due Process Clause, a [pretrial] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). Although Palmer had previously been convicted of auto theft, the underlying crime relating to Palmer's probation violation, at the time he

was assaulted and was being held at the Marion County Jail, he was awaiting a hearing on his probation violation. Thus, to determine which provision of the Constitution Palmer's claims implicate, this Court would need to decide whether the underlying car theft conviction or the establishment of a probation violation operates as the "formal adjudication" required under the Eighth Amendment.

Such an inquiry would be purely academic because Palmer alleged in his complaint that he was protected from the "deliberate indifference" of jail officials towards prisoners' safety; "deliberate indifference" is the recognized standard of protection afforded to both convicted prisoners and pretrial detainees under the Eighth and Fourteenth Amendments respectively. *County of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998); *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003); *Butera*, 285 F.3d at 605; *Brown*, 240 F.3d at 388; *Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir. 2000). Deliberate indifference whether in the prison or jail context requires Palmer to establish two elements. First, Palmer must objectively show that he was incarcerated under conditions posing a "substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Langston v. Peters*, 100 F.3d 1235, 1237 (7th Cir. 1996). Second, Palmer must establish that the defendants had knowledge of and disregarded the risk to his safety. *See Farmer*, 511 U.S. at 837 ("[A] prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health or safety."); *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997) ("[Plaintiff] must demonstrate that the defendants had 'actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendants failure to prevent it.'" (quoting *McGill v. Duckworth*, 944 F.2d 344, 348 (7th Cir. 1991))). However, this Court has frequently reiterated

that there is no requirement that jail officials, acting in their official capacity, ensure the safety of their inmates and the "existence or possibility of other better policies which might have been used does not necessarily mean that the [jail officials were] being deliberately indifferent." *Butera*, 285 F.3d at 605. Thus, in order to overturn summary judgment, Palmer must demonstrate a genuine question of fact as to whether the defendants were deliberately indifferent to his safety. *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000).

### A.  The Sheriff in His Individual Capacity

Palmer has made no showing that Sheriff Cottey was personally involved in the decision making allegedly amounting to violation of Palmer's constitutional rights; thus, we can dispose of Palmer's claims against Sheriff Cottey in his individual capacity in short order. Because "§ 1983 does not allow actions against individuals merely for their supervisory role of others," *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000), "[i]ndividual liability under 42 U.S.C. § 1983 can only be based on a finding that the defendant caused the deprivation at issue." *Kelly v. Mun. Courts of Marion County*, 97 F.3d 902, 909 (7th Cir. 1996). In addition to the element of deliberate indifference, *Lewis*, 107 F.3d at 553, § 1983 lawsuits against individuals require personal involvement in the alleged constitutional deprivation to support a viable claim. *Zentmyer*, 220 F.3d at 811; *Zimmerman*, 226 F.3d at 574; *Davis v. Zirkelbach*, 149 F.3d 614, 619 (7th Cir. 1998). Although direct participation is not necessary, there must at least be a showing that the Sheriff acquiesced in some demonstrable way in the alleged constitutional violation. *Kelly*, 97 F.3d at 909; *Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir. 1986). To prevail on his claim, Palmer must establish that Sheriff Cottey actually knew that Palmer

was assigned to Cell Block 2T and that the Sheriff inferred from that assignment that there was a substantial risk of serious harm to Palmer. *See Farmer*, 511 U.S. at 837 ("the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"); *Lewis*, 107 F.3d at 553 ("the official must actually know and disregard the risk to incur culpability"). Palmer, however, has failed to make any showing that Sheriff Cottey had knowledge of the initial fight in Cell Block 2T, or the risk Palmer faced when he was assigned to Cell Block 2W.

## B. Municipal Liability

With respect to his claims against the City of Indianapolis and Marion County, although the Supreme Court has held that municipalities are susceptible to liability under § 1983, *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978), "municipalities cannot be held liable for § 1983 claims under a theory of respondeat superior." *Garrison v. Burke*, 165 F.3d 565, 571 (7th Cir. 1999) (citing *Monell*, 436 U.S. at 691); *accord Zirkelbach*, 149 F.3d at 619; *Sivard v. Pulaski County*, 17 F.3d 185, 188 (7th Cir. 1994). Thus, to establish a genuine question of fact as to whether these government entities were deliberately indifferent to Palmer's safety, Palmer is required to establish that the entities have a custom or policy that contributed to the infliction of the assault and his resulting injury. *Frake*, 210 F.3d at 781; *Garrison,* 165 F.3d at 571; *see also Butera*, 285 F.3d at 605 ("[I]f the Sheriff had notice of a substantial risk of serious harm to [plaintiff] . . . through the general conditions at the Jail, and he devised no policies or devised inadequate policies to attempt to prevent the assault, he would be 'deliberately indifferent' and [plaintiff] would prevail."); *Monell*, 436 U.S. at 694 ("[I]t is when execution of a government's policy or

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). "[T]here must be an affirmative link between the policy and the particular constitutional violation alleged." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).

Unconstitutional policies or customs can take three forms:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority.

*Garrison,* 165 F.3d at 571-72 (quotations omitted); *accord Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002); *Brokaw v. Mercer County*, 235 F.3d 1000, 1013 (7th Cir. 2000). Palmer claims the defendants' unconstitutional policy fits in the second *Garrison* category because the defendants were deliberately indifferent to his safety through their widespread practice at the Marion County Jail of placing black prisoners in cell blocks referred to in prison parlance as gladiator cell blocks,[2] such as Cell Blocks 2T and 2W. Palmer asserts the defendants housed predominantly black prisoners in the cell blocks commonly referred to as gladiator cell blocks and that the Jail's staff failed to respond to overt acts of violence in the above referred to gladiator cells in a timely manner. As

---

[2] According to Palmer, "gladiator" cell blocks are cell blocks in which correctional officers control and punish the most violent inmates by allowing the inmates to engage in violence against each other without the timely intervention by the Jail's staff.

discussed in subsequent paragraphs, Palmer's argument fails because there is no evidence in the record supporting his allegations that Marion County Jail had either a widespread practice of allowing inmates to fight or that the Jail segregated its inmates according to race.

Because Palmer bears the burden of proving the defendants' unconstitutional custom of utilizing gladiator cell blocks at trial, to defeat summary judgment Palmer must set forth specific facts showing that there is a genuine issue of fact remaining regarding the use of gladiator cell blocks to warrant a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Palmer claims that he satisfies this burden because his affidavit states that he "personally observed" the Marion County Jail's practice of (1) segregating inmates by race; (2) placing gang members with non-gang members; (3) not segregating inmates who feel threatened; and (4) not intervening to stop inmate-on-inmate violence in the gladiator cell blocks, although he makes no specification of when and where the correctional officers failed to intervene other than the incident in which he was involved. Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits be made on personal knowledge.[3] *Watson v. Lithonia Lighting*, 304 F.3d 749, 751-52 (7th Cir. 2002). Palmer has failed to set forth how he gained personal knowledge during his incarceration at the Marion County Jail into the Jail's widespread practice involving gladiator blocks, and we refuse to speculate. Palmer's observations of the Jail's day-to-day operations over a relatively short period of time and his alleged personal knowledge of the assaults he and another inmate suffered fall far short of demonstrating a

---

[3] Rule 56(e) states, "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

pattern of events by correctional officers indicative of an unconstitutional custom or practice. Palmer was incarcerated in the Marion County Jail for about one year, yet has personal knowledge, according to his affidavit, of only two incidents[4] of inmate-on-inmate violence in which correctional officers failed to timely intervene. When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference. *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995); *see also Tuttle*, 471 U.S. at 823-24 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."). Palmer's alleged personal knowledge of two incidents of misconduct by correctional officers in a period of one year certainly fails to meet the test of a widespread unconstitutional practice by the Jail's staff that is so well settled that it constitutes a custom or usage with the force of law. *See Looper Maint. Serv. Inc. v. City of Indianapolis*, 197 F.3d 908, 912 (7th Cir. 1999) (describing a custom or usage as a practice that, "although not codified in written law or regulation, is so permanent and well-settled that it has the force of law"). Essentially, Palmer fails to avoid summary judgment on his claim that the defendants were deliberately indifferent to his safety because the record is devoid of evidence that the Jail's staff had a widespread practice of allowing violence to occur in any cell block, let alone specific gladiator cell blocks.

---

[4] This figure counts the assault of the other Cell Block 2T inmate discussed by Palmer in his affidavit as a separate incident.

Likewise, Palmer's half-hearted claim that Marion County Jail officials segregate inmates by race[5] also fails because Palmer has not set forth any information that would lead one to believe that the Jail's staff actually segregate detainees according to race. Palmer has no personal knowledge of what criteria Jail officials evaluate to assign inmates to specific cell blocks. *See Ford v. Wilson*, 90 F.3d 245, 248 (7th Cir. 1996) (holding that the plaintiff's assertions that he was stopped and detained on account of his race were not allegations of fact within the plaintiff's personal knowledge). Palmer concedes that Cell Blocks 2T and 2W are designated to house the most violent inmates (black or white) at the Marion County, Indiana Jail, and Palmer does not dispute his classification as a violent detainee. The only mention in the record that jailed inmates in the County Jail are segregated by race is set forth in Palmer's affidavit. This Court, on numerous occasions, has made it clear that self-serving affidavits, without any factual support in the record, are insufficient to defeat a motion for summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").

Palmer argues that to require a greater showing of an unconstitutional policy than that presented in his affidavit would be far too burdensome in light of the unlikelihood that municipalities would publish an unconstitutional policy. Palmer's point ignores the fact that there are a number of other avenues to demonstrate a widespread practice of an unconstitutional nature. For example, during discovery Palmer might have queried Jail officials

---

[5] In argument before this Court, Palmer described the gladiator blocks as housing "very few" white inmates.

as to what criteria is used when assigning detainees to designated cell blocks. *See Natale v. Camden County Corr. Facility*, 318 F.3d 575, 584-85 (3d Cir. 2003) (holding that testimony from a Prison Health Service employee that there was no policy of ensuring that an inmate in need of medication would be given medication in the first 72 hours of incarceration, created a genuine issue of fact as to whether the municipality was deliberately indifferent to prisoners' serious medical needs). Similarly, Palmer could have obtained raw data from the defendants' records regarding cell block assignments as well as the frequency of inmate-on-inmate assaults. *See Walsh v. Mellas*, 837 F.2d 789, 793 (7th Cir. 1988) (affirming a finding of § 1983 liability against two prison officials who devised and operated a security system which ignored the risk of housing "targeted" inmates[6] with members of a vengeful prison gang). Instead, Palmer points only to his own assault and the fact that there was another beaten detainee in Cell Block 2T at the same time as specific facts sufficient to defeat summary judgment. These facts alone demonstrate nothing more than isolated incidents of inmate-on-inmate brutality; a showing of isolated incidents does not create a genuine issue as to whether defendants have a general policy or a widespread practice of an unconstitutional nature. *Jackson*, 66 F.3d at 152.

To the contrary, the undisputed facts tend to show that the defendants adopted a policy that considered Palmer's safety. Immediately after the first assault Palmer was removed from Cell Block 2W. After identifying his assailants, Palmer was reassigned to a new cell block. Upon learning of Palmer's dissatisfaction with his new cell block assignment, officers provided Palmer the opportunity to choose between his assigned cell and deadlock.

---

[6] Targeted inmates are inmates who have been singled out for attack by a prison gang.

Palmer chose the assigned cell. Although the vicious beating that resulted is both tragic and unfortunate, the Constitution does not require prison and jail authorities to ensure the safety of their detainees. *Butera*, 285 F.3d at 605.

Palmer also alleges that the defendant municipalities are liable under § 1983 because they failed to properly hire, train, and supervise their correctional officers. Although liability against a municipality may attach if persuasive evidence is presented of a training policy or custom, or lack thereof, which reflects a showing of deliberate indifference on the part of a municipality to the constitutional rights of its inhabitants, *City of Canton v. Harris*, 489 U.S. 378, 389-92 (1989); *Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir. 1994); *Smith v. City of Joliet*, 965 F.2d 235, 237 (7th Cir. 1992), Palmer's claim fails because he did not present so much as a scintilla of evidence that the defendants improperly hired, trained, or supervised the Marion County Jail's staff. Because the record is devoid of evidence showing a pattern, custom, or policy of an unconstitutional nature, Palmer's argument that the defendant municipalities were deliberately indifferent to his safety, thereby permitting § 1983 liability, fails.

Palmer also pled that the defendants negligently trained, hired, and supervised Jail employees under Indiana law. Although this Court recently noted that respondeat superior liability exists in Indiana tort law and that under Indiana law summary judgment is generally not appropriate in negligence actions, *Perkins*, 312 F.3d at 876, because Palmer failed to delineate his negligence claim in his district court brief in opposition to summary judgment or in his brief to this Court, his negligence claim is deemed abandoned. *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (holding that a claim not raised in an appellate brief is abandoned); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999)

(stating that arguments not presented to the district court in response to summary judgement motions are waived); *Medley v. City of Milwaukee*, 969 F.2d 312, 317 (7th Cir. 1992) (holding that claims not argued on appeal are abandoned); *see also* Fed. R. App. P. 28(a)(9)(A) (requiring the appellant's brief to include an argument containing "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*