# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-3750

ROGER RASCHE and VELMA RASCHE,

*Plaintiffs-Appellants,*

v.

VILLAGE OF BEECHER, an Illinois
Municipal Corporation and PAUL
LOHMANN, individually and as Agent
for the Village of Beecher,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 2168—**Joan Humphrey Lefkow**, *Judge.*

ARGUED MAY 30, 2003—DECIDED JULY 16, 2003

Before FLAUM, *Chief Judge*, EASTERBROOK and RIPPLE, *Circuit Judges.*

RIPPLE, *Circuit Judge.*   Roger and Velma Rasche ("the Rasches") brought this action pursuant to 42 U.S.C. § 1983 against the Village of Beecher and the Village President Paul Lohmann. They alleged that they had been the victims of retaliation because they had exercised their First Amendment rights by opposing Village bond proposals. The district court granted summary judgment for the Vil-

lage and for Mr. Lohmann. The Rasches appeal. For the reasons set forth in this opinion, we now affirm the judgment of the district court.

# I
## BACKGROUND

Roger Rasche owns and operates a vehicle towing business out of his home, located on Illinois Route 1 within the Village of Beecher, Illinois. He began his business in 1978 and has maintained a sign on his property since 1978. The business is licensed only in Mr. Rasche's name, but his wife, Velma Rasche, works full time for the business and does not receive a separate salary. Mr. Rasche therefore characterizes the business as a "family business" owned by himself and his wife. R.37, Ex.3 at 12-13.[1]

The Village of Beecher, Illinois, is a municipal corporation with a Board of Trustees. The Village President is Paul Lohmann, an individual defendant in this action. In 1997, the Village Board of Trustees enacted an ordinance authorizing the issuance of $4.5 million in bonds for the purchase of a golf course. Mr. Rasche was a principal organizer of a petition drive to require a referendum concerning the purchase of the course. Mr. Rasche spoke publicly concerning this effort, in addition to co-sponsoring a political advertisement in a newspaper and delivering fliers listing his home number. According to a Village resident, Pat Schroeder, one of the Trustees, Gary LaGesse,

---

[1] We see no reason to disturb the district court's determination that Mrs. Rasche's interest in this litigation is sufficient to give her standing to appear as a litigant in this action. *See infra* note 8.

in his capacity as the chair of an unrelated association, the Beecher Recreation Association, stated at a meeting of that association in 1997 that he "would get even with anyone opposed to the Golf Course Referendum" and that he "would take out anybody who stood in [the] way of purchasing [the] golf course." R.37, Ex.6 at 10, 40. The voters of the Village of Beecher defeated the purchase of the golf course at an election held on March 17, 1998.

In 1999, the Village of Beecher Board enacted an ordinance to issue $907,000 of bonds to pay for improvements to the Village waterworks. Mrs. Rasche was the leader and initiator of the petition drive to obtain a referendum on that proposal. The Rasches circulated the majority of the petitions on the waterworks bonds, and Mrs. Rasche filed the petitions with the Village of Beecher City Clerk. The waterworks bond ordinance was defeated by the Village of Beecher voters in an election held on March 21, 2000.

At least as early as 1997, the Village Board of Trustees was concerned about the appearance of Route 1. In July 1997, the Village Trustees decided to authorize enforcement of the Village's ordinance against temporary or portable signs. On August 11, 1997, at their meeting, the Trustees addressed whether the ordinance prohibited temporary or portable signs.[2] The Board did not take immediate action, but held a public hearing on the temporary or portable sign issue. Affected property owners, including the Rasches, received notification by letter. At

---

[2] The ordinance does not expressly prohibit temporary and portable signs, but it defines a sign as one that is affixed on land or a structure—thus arguably excluding, at least by implication, temporary and portable signs. Under the ordinance, all signs must be approved by the building inspector on application for a permit. *See* R.32, Ex.A at 3.

the meeting, which Mr. Rasche attended, the signs of the Rasches and seven other businesses were discussed.

At the time it was purchased in 1978, the Rasches' sign was portable. However, Mr. Rasche had rotated the wheels upward, had placed the sign on bricks and had affixed it to the ground by a play swing cable. The sign had chicken wire wrapped around it to prevent the letters from blowing off. An extension cord from the Rasche's garage provided power to flashing lights on the sign. Mr. Rasche did not obtain a building permit when he installed the sign in 1978.

The zoning ordinance regarding signs had been enacted in 1974. Under the 1974 code, before a sign could be erected, the owner had to obtain a building permit and approval from the building inspector. Although the code did not prohibit explicitly temporary or portable signs, it impliedly defined a sign as requiring a foundation. A sign is defined as "a name, identification, description, illustration . . . *which is affixed* . . . upon a structure or land." R.32, Ex.A at 3 (emphasis added). In 1992, the Village amended its zoning ordinance to prohibit "flashing signs," to require that any wiring conform to the electrical code and to require that the sign be able to withstand wind pressure of not less than thirty pounds per square foot. *Id.* The code also stated that prior existing non-conforming signs could be used for any remaining depreciation in value, but not to exceed five years beyond the enactment of the ordinance.

In 1999, the Village appointed its first "Code Enforcement Officer," Julie Riechers. Her duties included identifying any code violations and speaking with the owners about conforming to the requirements. Village Trustee Patrick Lane stated in his deposition that it was his understanding "that with respect to signs and compliance with

the sign ordinances of the Village of Beecher that would have been solely Julie's [Riechers'] responsibility as to what were proper signs and what were improper signs." R.37, Ex.10 at 24-25. In the spring of 1999, Village President, Paul Lohmann, and the Village Administrator,[3] Robert Barber, expressed to Riechers their concern about the appearance of Route 1.[4]

---

[3] According to Mr. Barber, his duties as the Village Administrator "include making recommendations to the Village Board of Trustees regarding local legislation, zoning and building issues, and local ordinance enforcement." R.32, Ex.A at ¶ 3. He attends all meetings of the Board of Trustees and answers to and takes direction from the Board of Trustees and the Village President. *See id.* at ¶¶ 2-4.

[4] The Rasches maintain that, at this meeting, the "only specific sign that Barber and Lohmann directed Riechers to look at was the Rasches' sign." Appellants' Br. at 6. However, as noted by the district court, this characterization misrepresents the record. The Rasches base their assertion solely on a statement made on page 25 of Riechers' deposition. In response to the question, "[D]id [Mr. Lohmann and the Village Administrator] mention the Rasche sign to you as one of the signs they wanted you to look at?," Ms. Riechers responded "yes." R.32, Ex.Riechers' Dep. at 25. It initially should be noted that this response itself does not state, as the Rasches contend, that the Rasche sign was the *only* sign mentioned; rather the response indicates that the Rasche sign was "one of the signs they wanted [Ms. Riechers] to look at." *Id.* Further, the dialogue immediately following this question completely negates plaintiff's contention:

   Q:   . . . [D]id they mention the Rasche sign to you as one of the signs they wanted you to look at?

   A:  Yes. [end of page 25]

(continued...)

---

[4] (...continued)

Q:  Did they mention any other signs by name?

A:  Risings, Shady Long Golf Course.

Q:  Excuse me a second. Risings, Shady Long Golf Course?

A:  Actually I think I'm going to take that back. I assumed this all on my own. I'm thinking about it. No one told me to deal with any particular thing. They just said go to Route 1, pick out things that you think are in violation.

Q:  Of the Village—

A:  Anything, right.

Q:  Of anything?

A:  Right. They did not tell me anything like even the sign, the Rasche sign. We just discussed different—I just actually did it on my own.

*Id.* at 25-26.

The Rasches do not include page 26 of the deposition in their appendix, although they do include and cite to page 25. They forwarded the same mischaracterization of facts in the district court. The district court explained:

> While plaintiffs allege that at this meeting the only sign Lohmann told Riechers to specifically look at was Roger's sign, they present at best a scintilla of evidence of this fact. Plaintiffs rely on Riechers' deposition where she states that Barber and Lohmann did mention the Rasche sign as one they wanted Riechers to look at. A few lines later, however, Riechers retracted the statement and testified, "Actually I think I'm going to take that back. I assumed this all on my own. I'm thinking about it. No one told me to deal with any particular thing. They just said go to Route 1, and pick out things that you think are in violation." (Riechers Dep. at 25-26.) (Disappointingly, plaintiffs fail to acknowledge page 26 of Riechers' deposition testi-
>
> (continued...)

On July 9, 1999, Riechers visited with seven business owners, including Mr. Rasche, concerning their zoning violations. On July 14 and 15, 1999, Riechers sent letters to building owners who were not available on July 9, explaining that their signs were in violation of the Village Zoning Ordinance, that the sign needed to be removed within 30 days and that the Village might file with the Village Attorney a formal complaint. *See* R.32, Ex.J. Her memorandum to the Trustees, dated July 16, states that some of the property owners had complied with the prior instructions. This memo also notes that on July 9, Riechers spoke with Mr. Rasche, "gave him copies of the Ordinances he was violating and gave him 30 days to remove the sign and clean up the junk. He was also issued a ticket for no village sticker on the RV that he owns and is parked in front of his house." R.32, Ex.M at 1.

On August 9, Riechers visited several property owners, including Mr. Rasche. This time she reported that Mr. Rasche had "clean[ed] up the junk in the driveway. However, the sign was still there and he was issued a ticket for $25.00. He did unplug the extension cord and the sign

---

[4] (...continued)

mony.) With no argument addressing the testimony, which fairly read is that Lohmann did not single out the Rasche property, there is no basis to infer retaliation based on this meeting.

R.40 at 8. In a footnote, the court recognized that Riechers' immediate recantation "is consistent with another portion of Riechers' deposition testimony. Riechers previously was asked if specific property owners along Route 1 were singled out for her to talk to. Riechers responded that there were not, and that she was to talk to all property or business owners along Route 1. (*Id.* at 20)." R.40 at 8 n.8.

is not lighted or flashing anymore." R.32, Ex.N at 1. Riechers
details in these reports approximately sixty actions she
took in connection with code enforcement from June 1999
to May 2000.[5]

_____

[5] The Rasches state repeatedly in their brief that "[w]hen Code
Enforcement Officer Riechers went out to determine if any
business signs along State Route 1 violated the Village of
Beecher's sign ordinance, she did not determine whether
any other business signs were in violation of the Village of
Beecher sign ordinance except Rasche's. (Appendix No. 11, pp.
112-133.)" Appellants' Br. at 8-9. The record does not support
this assertion. For example, on pages 26-27 of her deposition,
Riechers details that she told four other businesses to remove
their signs because the signs were not permanent, had wheels
or were otherwise not affixed to the ground—which was the
same violation the Rasches allegedly committed. *See* R.32,
Ex.Riechers' Dep. at 26-27. Also, Riechers produced letters sent
to other business owners who were told that their signs were
in violation and that they were required to remove or to
change their sign. *See* R.32, Ex.J. She specifically stated in these
letters (dated July 14 and 15, 1999) that she and the Chief of
Police, Mark DiSanto, "went to all local businesses on Dixie
Highway to talk to the owners regarding various code viola-
tions" and to explain that the property owner's sign was in
violation of the code and needed to be removed in the next 30
days. *Id.* The letters warn that, if the signs are not removed, "the
Village may file a formal complaint with the Village Attorney."
*Id.* The Rasches also emphasize that the sign on Knuth's Coun-
try Corner Restaurant, owned by relatives of the Village Attor-
ney, was in violation of the ordinance because the restaurant
went out of business in November of 2000 and it is a violation
to have a sign on a vacant building. Riechers testified that
a citation had not been issued to Knuth for his sign because
in February 2001 (three months after the store closed), Knuth
had "removed some of the signs. He has not removed the
(continued...)

In July 1999, the Village adopted a local adjudication system to handle ordinance violations. The Rasches received numerous warnings and citations for alleged zoning violations on their property. On August 20, 1999, the Rasches received another ticket (No. 4101) for the sign. On October 1, 1999, the Rasches received a warning about a motor home parked on their property.

On approximately October 21, 1999, Mr. Rasche appeared before the Village adjudication system and ticket No. 4101 was dismissed.[6] On November 23, 1999, the August 9, 1999, ticket for the sign was dismissed in the Illinois state circuit court.

On December 13, 1999, the Rasches received a ticket for having an inoperable vehicle on their property. On December 17, 1999, they received a notice from the Vil-

_____

[5] (...continued)
giant sign that's on the corner yet. But he has been working with me on it." R.37, Ex.1 at 32. According to Riechers' deposition, on February 21, 2001, Knuth asked for a few more weeks to get the large corner sign down because "he said he had more problems getting that one down. But he did remove the other ones . . . ." *Id.* at 33. Thus Riechers had not issued a citation yet, as of her March 2001 deposition, "because he has spoken with me and worked with me on it." *Id.* at 32.

[6] In the Rasches' statement of facts, this fact appears twice, but refers to the same occasion and the same ticket—not two different occasions or tickets. *See* Appellants' Br. at 7 (discussing at top of page that "the Beecher Adjudicatory Hearing Officer dismissed Ticket No. 4101" and stating at bottom of page after discussing issuance of further tickets that the "ticket for the illegal sign, No. 4101, was dismissed by the hearing officer on October 21, 1999 because it was not an offense covered by the Adjudicatory Ordinance").

lage of Beecher demanding that their sign be removed. On January 5, 2000, the Rasches received seven additional tickets for having inoperable vehicles in their front yard. The inoperable motor vehicle tickets were issued by Tim Mitchell, a Village police officer at the direction of Beecher Chief of Police Mark DiSanto. At the same time, another business, Jody's Transmission Service, also located on Route 1, was issued 29 citations for inoperable vehicles parked in its front yard.

Robert Barber, the Village Administrator, testified that, even though he "believed that under our Village Ordinance we had the authority to enter upon Rasche's property and remove a non-complying sign, [he] felt uncomfortable and recommended to the Trustees, in an Executive Session, that we file a Long Form Complaint in State Court and let the State Court Judge make the determination. The Trustees concurred with my recommendation. At the Executive Session, possible violations were discussed and direction was given to the Village Attorney, Mr. Knuth, to research the matter and draft a Long Form Complaint for filing in the Circuit Court." R.32, Ex.A at ¶¶ 49-50. Trustee LaGesse testified that, at a Village board meeting, the Village Attorney received "the approval of the village board before he filed the lawsuit" against the Rasches. R.37, Ex.12 at 33. Village Administrator Barber testified that the reason for bringing the long form complaint was that "[w]ith the exception of Roger Rasche . . . all of the business owners along Route 1 complied with Julie Riechers' requests" and either removed their signs or brought them into compliance. R.32, Ex.A at ¶ 56.

On January 12, 2000, the Village Attorney filed a two-count complaint against Mr. Rasche, alleging that the sign was erected and the electrical connection was in-

stalled without the required building permits. On November 28, 2000, the state court granted Mr. Rasche's motion for a directed verdict.[7]

On February 17, 2000, Mr. Rasche appeared before the Village adjudication system court on his remaining tickets (Nos. 4488 and 4304 through 4310); these citations were dismissed. In sum, the Village adjudicatory officer dismissed all citations issued to Mr. Rasche for the sign and inoperable vehicles. The Rasches contend that the officer dismissed the citations because they were not among the violations that could be prosecuted through the local adjudication system. Defendants maintain that the adjudicatory officer dismissed the tickets because the wrong statutory section was listed for the alleged violation and Mr. Rasche was trying to keep his inoperable vehicles away from the front yard. *See* Appellees' Br. at 7-8.

---

[7] The state court's order directing the verdict states in its entirety: "This cause comes before the Court for decision on Defendant's Motion for Directed Finding, the Court citing *People, ex rel Adams Elec. Co-op v. Village of Cant Point* [*sic., Camp Point*], 286 Ill. App. 3d 247 [1997] and *Village of Riverwoods v. Untermyer*, 54 Ill. App. 3d 816 [1977], hereby grants the Motion for Directed Finding and all cases outlined in defendants brief." Appellants' App. at 53. The defendants had argued in their brief supporting their motion for directed verdict that the Village had failed to "offer into evidence the Village ordinance itself with publication noted thereon it, certified and signed by the Village Clerk and therefore, as a matter of law, the Village did not prove the existence of any ordinance under which Roger Rasche is charged." *Id.* at 39 (citing *Village of Riverwoods*, 54 Ill. App. 3d 816). Moreover, the Village had failed to offer into evidence "the Book of Ordinances" and thus failed to establish "the existence of the ordinance." *Id.* at 39 (citing *Village of Camp Point*, 286 Ill. App. 3d 247).

In early 2000, the Village repealed the ordinance creating the local adjudication system. Village Administrator Barber explained that he had "received a letter from our retained hearing officer, John Murphey, resigning as hearing officer; and he also advised the Village that in enacting our Adjudicatory Ordinance, we neglected to include zoning violations within the purview of the ordinance, and he maintained that he had no jurisdiction over tickets covering ordinance violations." R.32, Ex.A at ¶ 54. Consequently, "[w]ith the resignation of the hearing officer, and because we concluded that the use of the ordinance was not cost effective, the Trustees repealed our Adjudicatory Ordinance." *Id.* at ¶ 55.

## II

### PROCEEDINGS IN THE DISTRICT COURT

The Rasches brought this § 1983 action against Mr. Lohmann in both his individual and official capacity and against the Village. They allege that the citations and warnings were issued in retaliation for the exercise of their First Amendment rights in speaking out against the Village's golf and waterworks bond proposals.

The district court granted summary judgment to Mr. Lohmann and to the Village.[8] The district court noted

---

[8] Before reaching the merits, the court first noted that, because "claims against individuals in their official capacities are suits against the municipality," it need only consider the claim against Mr. Lohmann in his individual capacity and the claim against the Village. R.40 at 6 n.5.

The court also determined that Mrs. Rasche had standing despite the Village's argument that "she did not have any
(continued...)

initially that summary judgment was appropriate because "(1) Lohmann was not personally involved in the alleged constitutional deprivation; (2) the alleged retaliatory actions cannot be attributed to the Village because they were not taken by a person with final policymaking authority." R.40 at 7. Consequently, stated the court, it was unnecessary to address the question of whether the plaintiffs "show[ed] that their constitutionally protected speech was a motivating factor in defendants' actions." *Id.*

With respect to Mr. Lohmann, the court determined that, "[a]lthough the record establishes that Lohmann was aware of the Village's efforts to enforce the sign ordinance along Route 1, plaintiffs provide no evidence that he was aware of any Village official's retaliatory motive and no evidence that Lohmann either directed the conduct or consented to it." *Id.* at 9.

As for the claims against the Village, the district court simply stated that: "Because the facts read in a light most favorable to the plaintiffs do not create a genuine issue of material fact that plaintiffs' constitutional right to free expression was denied, it is unnecessary to ad-

---

[8] (...continued)
ownership interests in the business and none of the citations were issued against her." *Id.* at 7 n.7. The district court concluded that "[t]he facts indicate that Velma has an ownership interest because Rasche Towing may be a family business. Also, because Velma asserts that defendants retaliated against *her* First Amendment rights, she has standing to assert an injury sustained as a result" and she is not bringing claims "on behalf of third parties," but "asserts her own claim, not that of her husband." *Id.*

dress the question of municipal liability." *Id.* at 9-10.[9] Nevertheless, the district court went on to note in a footnote that:

> Plaintiffs seem to argue that Riechers or DiSanto was a final policymaker that would make the Village liable, even though neither of these individuals is named as a defendant accused of depriving them of their rights. The only relevant question then is whether Lohmann was a final policymaker, and since he has prevailed on the motion, the Village likewise is not liable. Obviously, Riechers was not a final policymaker because all of the evidence indicates that she was an employee following her superiors' directions. DiSanto, as police chief, did not enact the sign ordinance, and it is undisputed that the concern about enforcement derived from the Board. There is absolutely no evidence that DiSanto was a final policymaker, to say nothing of the lack of evidence that he had a motive to retaliate against plaintiffs based on their exercise of protected speech.

*Id.* at 10 n.9.

---

[9] This statement seems contrary to the court's earlier statement that because it agreed that the actions were not attributable to the Village (no municipal liability), it would not consider the question of whether the exercise of their First Amendment rights was a motivating or substantial factor in the Village's issuance of the citations. *See* R.40 at 7.

### III

### DISCUSSION

#### A.

We first address whether the district court erred in granting summary judgment in favor of Mr. Lohmann. In examining this issue, we apply a well-established three-step analytical framework. We first ask whether the plaintiff's speech was constitutionally protected. *See Vukadinovich v. Bd. of Sch. Trus. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002). If the speech was protected, we ask whether the defendants' actions were motivated by that constitutionally protected speech. *See id.* If the plaintiff can show that his constitutionally protected speech was a substantial or motivating factor, the defendants must show that they would have taken the same action in the absence of his exercise of his rights under the First Amendment. *See id.* If the defendants carry that burden, the plaintiff bears the burden of persuasion to show that the defendants' proffered reasons were pretextual and that retaliation was the real reason for the defendants' action. *See id.* We also note that, "[s]ection 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996) (internal quotation marks and citations omitted).

The district court correctly determined that the evidence in this record does not support a determination either that Mr. Lohmann "caused or participated in a constitutional deprivation," *Vance*, 97 F.3d at 991, or, under the three-step approach, that Mr. Lohmann's "actions [were] motivated by [the Rasches'] constitutionally protected

speech,"[10] *Vukadinovich*, 278 F.3d at 699. The Rasches' allegation that Mr. Lohmann directed Riechers to examine *only* the Rasches' sign will not sustain their burden in this regard. As noted at some length earlier, *see supra* note 4, Riechers gave two versions of her meeting with Village officials. If Riechers' initial deposition statement is true, Mr. Lohmann directed her to inspect not only the Rasches' sign but also the signs for Risings and for the Shady Long Golf Course. In that case, Mr. Lohmann did not tell her to look exclusively at the Rasches' sign. On the other hand, if Riechers' immediate retraction is accurate, Mr. Lohmann did not direct her to any particular sign. *See* R.32, Ex.Riechers' Dep. at 25-26. Neither version supports the view that Mr. Lohmann gave Riechers direction to focus exclusively on the Rasches' sign. Accordingly, the district court did not err in granting summary judgment for Mr. Lohmann.

## B.

We now turn to the issue of whether the district court erred in determining that summary judgment on behalf of the Village was warranted.

"[M]unicipalities cannot be held liable for § 1983 claims under a theory of respondeat superior." *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003) (internal quotation marks and citations omitted). The Rasches therefore must establish that "the deprivation of constitutional rights is caused by a municipal policy or custom." *Kujawski v. Bd. of Comm'rs of Bartholomew County*, 183 F.3d 734, 737 (7th Cir. 1999).

---

[10] It is undisputed that the Rasches' speech on the bond issues was constitutionally protected.

Under our case law, unconstitutional policies or customs can take three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Palmer*, 327 F.3d at 594-95. In our view, the Rasches cannot prevail under any of these theories.

The Rasches first submit that the Village is liable because the Board of Trustees directed the Village Attorney, or at least ratified the Village Attorney's decision, to file the state court suit against the Rasches. The Supreme Court has explained: "[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." *Bd. of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405 (1997).[11] Here, the Board of Trustees, the "municipality's legislative body," authorized a suit

---

[11] A municipality can ratify the action of its employees by "adopting an employee's action as its own" and thus becoming "the author of the action for purposes of liability under section 1983." *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001). In order to adopt such an action, the municipality must know of the "subordinate's conduct" and "approve[] of the conduct and the basis for it." *Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998) (internal quotation marks and citations omitted). Here, the Rasches argue that the Village, by authorizing the suit in state court, ratified the Village Attorney's actions. The suit is therefore an act by the Trustees. There is no evidence that the Trustees "ratified" any other actions (such as Riechers' or DiSanto's issuance of tickets).

against Mr. Rasche for an alleged violation of the sign ordinance. *Id.*

We therefore shall examine whether the Rasches' speech concerning the golf course and waterworks bond proposals was, on this record, "a substantial or motivating factor" in the Village's decision to bring suit against Mr. Rasche. *Vukadinovich*, 278 F.3d at 699. Evaluating the record in the light most favorable to the Rasches, the only evidence that the Village's decision to file suit was motivated by his speech is the proximity of time between the suit and the speech, and the testimony concerning a comment made by LaGesse in 1997 in his capacity as a member of the Beecher Recreation Association that he "would take out anybody who stood in [the] way of purchasing [the] golf course." R.37, Ex.6 at 10, 40.

The suit by the Village was brought soon after the waterworks referendum was put on the ballot. Although we have noted that a "telling temporal sequence" can be used to establish causation, *see Sweeney v. West*, 149 F.3d 550, 558 (7th Cir. 1998) (internal quotation marks omitted), we have also recognized in the analogous Title VII context that timing, "standing alone, does not create a genuine issue as to causal connection." *Foster v. Arthur Anderson, LLP*, 168 F.3d 1029, 1034 (7th Cir. 1999). A plaintiff must "show more than just temporal proximity." *Id.*

We do not believe that the statement by LaGesse, a single legislator, made in a different capacity and three years before the legislative action now in question can be considered sufficiently probative to provide the additional support needed to sustain a jury verdict.[12] The fact that LaGesse, three years prior to the Trustee's bring-

---

[12] We therefore need not decide whether this statement is admissible.

ing suit against the Rasches, in his capacity in a recreational association, was upset about losing the golf course does not demonstrate that the entire board of Trustees was motivated to retaliate unconstitutionally by bringing suit against Mr. Rasche for his sign. The importance of LaGesse's statement is rendered even more feeble when we recollect the context in which the Village Board took action. It referred the sign matter to litigation only after numerous attempts to obtain compliance and only after its attempts at local administrative resolution had proved fruitless. The Village Administrator's unrebutted testimony is that he recommended the lawsuit to ensure that the Rasches' sign was removed only after judicial scrutiny of the proposed action. There was, therefore, abundant evidence that this Board decision was taken in the normal course of its business of pursuing a long-term effort to improve the Village's appearance by a broad-scale enforcement of its zoning ordinances.

The Rasches also submit that the Village is liable under the first form of unconstitutional policies identified in *Palmer* because "the express policy of the Village as enforced caused a constitutional deprivation." Appellants' Br. at 21. The Rasches identify the "express policies" or "official policy" as "the Adjudicatory Ordinance and the sign ordinance." Appellants' Br. at 13, 18. The Rasches make no argument that either the zoning ordinance or the adjudicatory ordinance is unconstitutional or represents unconstitutional policies; thus these ordinances do not fall within the first definition of unconstitutional "express" policies. The Rasches nevertheless argue that the ordinances, although not unconstitutional in themselves, have

caused a constitutional violation.[13] We cannot accept this argument.

In order for a § 1983 plaintiff "to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights," the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Bryan County*, 520 U.S. at 407. The Rasches do not articulate how the obvious consequence of enacting the zoning ordinances was that the ordinances would be used to retaliate against Rasches' or other citizens' exercise of their First Amendment rights. As to the allegation that Mr. Lohmann specifically directed Riechers to examine only the Rasches' sign, we already have noted that the record will not support such an allegation.

As to the third form of unconstitutional policies or customs, the Rasches argue that various individuals possessed final policymaking authority. At the outset, we simply cannot conclude that the evidence would support a determination that a final policymaker's decision re-

---

[13] The Rasches later make an almost identical argument concerning Mr. Lohmann. They argue that, assuming he is a final policymaker, "Lohmann set in motion a series of acts by others, which he did, and reasonably knew or should have known that they would cause Riechers and the Police Chief to inflict the constitutional injuries retaliating against the Rasches only." Appellants' Br. at 16. Outside of the unsupported allegation that Mr. Lohmann directed Riechers to look at only the Rasches' sign, the Rasches give no indication of any activities that Mr. Lohmann "set in motion" which he "reasonably knew or should have known . . . would cause Riechers and the Police Chief to inflict the constitutional injuries retaliating against the Rasches only." Appellants' Br. at 16.

sulted in retaliation against the Rasches. "[M]unicipal lia-
bility under § 1983 attaches where—and only where—a
deliberate choice to follow a course of action is made from
among various alternatives by the official or officials re-
sponsible for establishing final policy *with respect to the
subject matter in question.*" *Pembaur v. City of Cincinnati*, 475
U.S. 469, 483-84 (1986) (emphasis added). In order to have
final policymaking authority, an official must possess
"[r]esponsibility for making law or setting policy," that
is, "authority to adopt rules for the conduct of govern-
ment." *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992)
(internal quotation marks and citations omitted). "Authority
to make municipal policy may be granted directly by a
legislative enactment or may be delegated by an official
who possesses such authority, and of course, whether an
official had final policymaking authority is a question
of state law." *Pembaur*, 475 U.S. at 483. In examining state
law to determine such authority, we are to "[r]eview[]
the relevant legal materials, including state and local
positive law, as well as custom or usage having the force
of law." *Kujawski*, 183 F.3d at 737 (internal quotation
marks and emphasis omitted).

   We have further elaborated on the term "final":

> *Every* public employee, including the policeman on
> the beat and the teacher in the public school, exercises
> authority ultimately delegated to him or her by their
> public employer's supreme governing organs. A po-
> lice officer has authority to arrest, and that authority
> is "final" in the practical sense that he doesn't have to
> consult anyone before making an arrest; likewise a
> teacher does not have to consult anyone before flunk-
> ing a student. That is a perfectly good use of the
> word "final" in ordinary conversation but it does not
> fit the cases; for if a police department or a school

district were liable for employees' actions that it authorized but did not direct, we would be back in the world of respondeat superior. To avoid this the cases limit municipal liability under section 1983 to situations in which the official who commits the alleged violation of the plaintiff's rights has authority that is final in the special sense that there is no higher authority.

*Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001).

Under this formulation, Riechers certainly was not the person with final policymaking authority; she occupied a position quite analogous to a police officer making an arrest. Although Trustee Lane stated that Riechers was responsible for determining what signs were proper, it is clear that Riechers did not set the zoning policy, enact the zoning ordinance or even determine what area of town required her concentrated scrutiny. She simply had the authority to issue tickets and citations. She testified that she focused on Route 1 at the behest of the Board of Trustees. *See* R.32, Ex.Riechers' Dep. at 19-20. She also reported her activities to the Board of Trustees. *See* R.32, Ex.M. The Board set the policy—including her area of focus, Route 1—for her enforcement of the zoning laws. Indeed, at page 15 of their brief, the Rasches admit as much in arguing that "the Village of Beecher retained the authority to measure [Riechers'] conduct for conformance with their policies and approved [Riechers'] decisions in only going after the Rasches." Appellants' Br. at 15. If the Village retained such authority, then Riechers' authority cannot constitute final policymaking authority.

With respect to Mr. Lohmann, the Rasches have brought forth no authority to establish that, as a matter of state law, he has the authority to make final municipal policy with

regard to zoning. Under Illinois law, it is the "corporate authorities" that have authority concerning zoning policy and enforcement. 65 ILCS 5/11-13-1. "Corporate authorities" include "the president and trustees or similar body when the reference is to villages or incorporated towns." 65 ILCS 5/1-1-2. Nevertheless, it appears that the president has only tie breaking authority, veto power (which can be overridden), and the power to "recommend . . . measures the . . . president believes expedient." 65 ILCS 5/3.1-35-5, 5/3.1-45-5, 5/3.1-40-30. In general, the president's responsibilities are to "perform all the duties which are prescribed by law, including ordinances, and shall take care that the laws and ordinances are faithfully executed." 65 ILCS 5/3.1-35-5. By contrast, the board of trustees has the authority to "pass ordinances, resolutions, and motions in the same manner as a city council." 65 ILCS 5/3.1-45-5. Generally, a person holding only executive power does not have policymaking authority for purposes of § 1983; rather, the policymaking authority in the city structure will be the city council, or here, the Board of Trustees. *See Auriemma*, 957 F.2d at 399-400. In any event, there is no evidence that Mr. Lohmann took any actions against the Rasches. Therefore, even if Mr. Lohmann were a final policymaker, he could not be held liable to the Rasches because there is no evidence that he took or directed any action against them.

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*